CV-17-5725

DEARIE, J.

Andrew M. Calamari
Lara S. Mehraban
Valerie A. Szczepanik
Jorge G. Tenreiro
Pamela Sawhney
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-9145 (Tenreiro)
Email: TenreiroJ@sec.gov

REYES, M.J.

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK
2017 SEP 29 PM 2:26
CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x

SECURITIES AND EXCHANGE COMMISSION,       :

                            **Plaintiff,**       :       17 Civ.       (      )
                                    :
        - against -       :       ECF Case
                                      :

RECOIN GROUP FOUNDATION, LLC, DRC       :       **COMPLAINT**
WORLD INC. a/k/a DIAMOND RESERVE CLUB,       :
and MAKSIM ZASLAVSKIY,       :
                                      :
                    **Defendants.**       :

------------------------------------------------------------ x

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint against Defendants REcoin Group Foundation, LLC ("REcoin"), DRC World, Inc., a/k/a Diamond Reserve Club ("Diamond," together with REcoin, the "Companies"), and Maksim Zaslavskiy ("Zaslavskiy"), alleges as follows:

## SUMMARY

1.    This is an emergency action brought to stop Zaslavskiy, individually and through his Companies, REcoin and Diamond, from engaging in illegal unregistered securities offerings and ongoing fraudulent conduct and misstatements designed to deceive investors in connection with the sale of securities in so-called "Initial Coin Offerings" ("ICOs").

2.      From July 2017 to the present, Zaslavskiy, the President and sole owner of the Companies, fraudulently raised at least $300,000 from hundreds of investors, through various material misrepresentations and deceptive acts relating to supposed investments in digital "tokens" or "coins" offered, first by REcoin, then by Diamond, during the ICOs.

3.      The ICOs for these supposed "tokens" or "coins" were illegal offerings of securities for which no registration statement was filed or then in effect, and as to which no exemption from registration was available. The ICOs were generalized solicitations made using statements posted on the Internet and distributed throughout the world, including in the United States, and the securities are being offered and sold to the general public.

4.      The stated purpose of each ICO was to convert "fiat currency," or "digital currency" obtained using fiat currency, into "tokenized" currency that would be backed by investments in certain assets (real estate in the case of REcoin and diamonds in the case of Diamond) that would generate returns for investors stemming from: (i) the appreciation in value of the investments Defendants would make, in the case of REcoin, in real estate assets, or, in the case of Diamond, in diamonds; (ii) the appreciation in value of the REcoin and Diamond tokens as the Companies' businesses grew to the managerial efforts of teams of "experts;" and (iii) the supposed increase in demand for the tokens.

5.      In connection with the ICOs, Defendants made the following false and misleading statements, among others, for which Zaslavskiy was solely responsible: (i) that investors were in fact purchasing digital "tokens" or "coins"; (ii) that Defendants had raised more than $2 million, and, later, nearly $4 million, from the REcoin ICO; (iii) that REcoin had a "team of lawyers, professionals, brokers, and accountants" that would invest REcoin's ICO proceeds into real estate and that Diamond had "experts" to select the best diamonds; (iv) that REcoin had to shut

2

down because the U.S. Government had forced it to do so; and (v) that investors in the REcoin ICO could expect to make returns from REcoin's investments in real estate and that investors in the Diamond ICO could expect to make 10-15% returns from Diamond's operations.

6.     Contrary to Defendants' false representations, and as Zaslavskiy knew or recklessly disregarded: (i) investors were not assigned any "tokens" or "coins" because none existed; (ii) the REcoin ICO raised only approximately $300,000; (iii) neither REcoin nor Diamond had hired or consulted any lawyers, brokers, accountants, developers, or other professionals to facilitate its investments; (iv) the U.S. Government did not force the REcoin ICO to shut down—Zaslavskiy has testified that he stopped the REcoin ICO because a token of the nature he had promised was "impossible to do;" and (v) Defendants could not pay returns because neither REcoin nor Diamond had any real operations.

7.     The foregoing false and misleading statements appeared variously on the Companies' websites, including in a "whitepaper" issued by REcoin in connection with the offer and sale of its securities during the REcoin ICO, as well as in numerous other online fora such as social media, websites, and press releases.

8.     In an attempt to skirt the registration requirements of the federal securities laws, Defendants Zaslavskiy and Diamond have refashioned the sale of the purported Diamond interests as sales of "memberships in a club," and the Diamond ICO as an "Initial Membership Offering" or "IMO." In reality, the supposed "memberships" are in all material respects identical to the ownership attributes of purchasing the purported (but, indeed, non-existent) "tokens" or "coins" and are securities within the meaning of the securities laws.

9.     Defendants are currently continuing to solicit and to raise funds under the guise of selling "memberships" in Diamond and are actively promoting the Diamond ICO.

## VIOLATIONS

10.     By engaging in the conduct set forth in this Complaint, the Defendants engaged in and are engaged in ongoing securities fraud in violation of Section 17(a)(1)-(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1)-(3)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) thereunder [17 C.F.R. § 240.10b-5(a)-(c)], and, without a registration statement being in effect or filed, the Defendants engaged and are engaged in the unlawful sale and offer to sell securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].  In addition, Defendant Zaslavskiy aided and abetted REcoin's and Diamond's violations of Sections 5(a), 5(c), and 17(a) of the Securities Act, and of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

11.     Unless the Defendants are permanently restrained and enjoined, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

12.     The Commission brings this action pursuant to the authority conferred upon it by Section 20 of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) & (d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(1) & (d)(5)].

13.     The Commission seeks, as immediate relief: (1) a temporary restraining order and a preliminary injunction against Defendants prohibiting them from future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and from participating in any offerings of unregistered securities or otherwise violating Sections 5(a) and 5(c) of the Securities

Act [15 U.S.C. §§ 77e(a), 77e(c)]; and (2) an order (a) freezing Defendants' assets; (b) permitting the Commission to conduct expedited discovery; (c) prohibiting Defendants from destroying or altering any documents; (d) requiring Defendants to provide verified accountings of proceeds; (e) requiring Defendants to repatriate assets; and (f) prohibiting Defendant Zaslavskiy from traveling abroad and requiring him to surrender his passport pending his provision of a verified accounting and repatriation of assets.

14.     The Commission also seeks a final judgment: (a) permanently enjoining the Defendants from engaging in acts, practices and courses of business alleged herein; (b) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon; (c) prohibiting Defendant Zaslavskiy, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any public company; (d) prohibiting Defendant Zaslavskiy, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], from participating in an offering of digital securities; and (e) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15 U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa]. Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

16.     Venue is proper in the Eastern District of New York pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Defendant Zaslavskiy resides here.

## DEFENDANTS

17.     **REcoin** is a Nevada limited liability company with a stated principal place of business in Las Vegas, Nevada. REcoin purportedly engaged in the business of investing in real estate and developing real estate-related "smart contracts." REcoin was organized as an LLC under the laws of Nevada in 2017.

18.     **Diamond** is a Puerto Rico corporation with its stated principal place of business in San Juan, Puerto Rico. Diamond purportedly invests in diamonds and obtains discounts with product retailers for individuals who purchase "memberships" in Diamond. Diamond was organized as a corporation under the laws of Puerto Rico in 2017.

19.     **Zaslavskiy**, age 38, resides in Brooklyn, New York. Zaslavskiy, who holds an LLM degree from Cardozo, is the sole owner of REcoin and the sole owner of Diamond, as well as the President, CEO, and only officer of both Companies.

## RELATED ENTITIES

20.     **Live Love Laugh Global** ("LLL") is a tax-exempt corporation organized under the laws of California in 2015, with a stated principal place of business in California. Zaslavskiy is the sole owner and officer of LLL.

21.     **101Lego LLC, a/k/a 101Lego Media Holding** ("Lego") is a corporation organized in 2017 under the laws of Nevada, and with a stated principal place of business in Las Vegas, Nevada. Zaslavskiy is its sole owner and officer. Lego purports to be a "dynamic digital media company that unites over 20 online news platforms" and that has a "global publishing network" that covers news including "pivotal financial and business news and analysis."

## BACKGROUND ON DIGITAL TOKENS OR COINS

22.     An ICO is a fundraising event in which an entity offers participants a unique "coin" or "token" in exchange for consideration (often in the form of virtual currency[1]—most commonly Bitcoin and Ether—or fiat currency).

23.     The tokens are issued on a "blockchain" or cryptographically secured ledger.[2]

24.     The token may entitle its holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights. These tokens may also be listed on online platforms, often called virtual currency exchanges, and tradable for virtual or fiat currencies. Often, the tokens are immediately tradable.

25.     ICOs are typically announced and promoted through public online channels. Issuers usually release a "whitepaper" describing the project and the terms of the

---

[1]     The Financial Action Task Force, an inter-governmental agency that promotes laws combating anti-money laundering and in which the United States is a member, describes virtual currency as a "digital representation of value that can be digitally traded and functions as (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status . . . in any jurisdiction." Virtual currency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency.

[2]     A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called blocks. Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain. The system relies on cryptographic techniques for secure recording of transactions. A blockchain can be shared and accessed by anyone with appropriate permissions. The Bitcoin blockchain is an example of a "non-permissioned," or public and open access blockchain. Anyone can download the Bitcoin open-source software and join. All participants share a single view of the Bitcoin blockchain, which is updated when Bitcoin network participants reach a consensus on the validity of transactions under review. "Permissioned" or private blockchains are modifications to that model and require permissioned servers to be approved to participate on the network or to access particular information on the blockchain. Blockchains or distributed ledgers can also record what are called smart contracts, which essentially are computer programs designed to execute the terms of a contract when certain triggering conditions are met.

ICO. To participate, investors are generally required to transfer funds (often virtual currency) to the issuer's address, online wallet, or other account. After the completion of the ICO, the issuer will distribute its unique "tokens" to the participants' unique address on the blockchain.

## FACTS

### Zaslavskiy and REcoin Fraudulently Raise Funds During the REcoin ICO.

26.   Starting in July of 2017, Zaslavskiy launched a website, https://101recoin.com, touting REcoin as "The First Ever Cryptocurrency Backed by Real Estate."

27.   Prominently displayed near the top of the website were two separate buttons that invited users to "BUY RECOIN," and another that linked users to REcoin's whitepaper. The REcoin website urged investors to "BUY RECOIN" in at least three other parts of the website.

28.   Clicking on the "BUY RECOIN" buttons led users to a page through which they could transfer funds to REcoin using their credit card, digital currency, or through online funds transfer services such as PayPal, which permit users to purchase goods and services from websites and mobile apps using the methods stored in that user's account, such as their credit cards or direct debit bank accounts.

29.   The link to the REcoin whitepaper led to a PDF document that contained additional statements about the supposed REcoin token, which the whitepaper described as "an attractive investment opportunity" that "grows in value."

30.   While at least two versions of the whitepaper have been made available through the website to investors, the original version was made public on the website from at least July 2017 through at least mid-August 2017 (the "REcoin Whitepaper").

31.   Another link on the REcoin website led to a page describing a "discount scheme" pursuant to which investors purchasing the coin during the first stage of the REcoin ICO would

receive a 15% discount.  The discount decreased as certain threshold levels of tokens were sold, until the close of the ICO, at which point one token would be sold at $1.

32.     The REcoin website contained a picture of Zaslavskiy, a biographical summary of his life, identified him as REcoin's "President and CEO" with "extensive expertise in real estate," and described him as a philanthropist who is "constantly volunteering and participating in many different charities."

33.     The REcoin ICO was set to run from August 7, 2017, through October 9, 2017.

34.     In a press release issued with respect to Diamond, Defendants themselves acknowledged that "[d]uring an ICO coins (tokens) are similar to shares of a company sold to investors in an Initial Public Offering (IPO) transaction."

35.     The investments offered during the REcoin ICO were "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

36.     On the REcoin website and in the REcoin Whitepaper, Zaslavskiy and REcoin made a series of false or misleading representations and omissions to potential and actual investors in the REcoin ICO.

37.     First, the REcoin website touted the supposed safety of investing in this particular digital asset, while trying to distinguish REcoin from others, because it was "backed" by real estate investments.  The website stated that "REcoin provides both investors and the average person, a safer, more secure and superior alternative to storing their wealth in the form of digital currency," and noting that while "no real commodities back the world's widely used currencies . . . [r]eal estate backs REcoin in countries with a [sic] developed and stable economies [sic] such as the United States, Canada, the U.K., Japan, and Switzerland."

38.     The REcoin Whitepaper repeated the foregoing statements and also noted that REcoin was "backed by secure real estate investments in the world's most advanced economies" and touted that the asset's "security is ensured through the use of one of the soundest and most reliable currency backings there is: real estate." The REcoin Whitepaper further noted that "All of the funds initially raised with REcoin . . . are invested into real estate."

39.     The REcoin Whitepaper further stated that "[t]he value of the currency can grow at least two ways: through the steady increasing value of the real estate investments that REcoin is used to purchase, and a higher REcoin value when the demand for REcoin rises," and urged investors to purchase REcoin because the real estate had the "potential for high returns."

40.     In fact, contrary to the foregoing false representations that "real estate backs REcoin," Zaslavskiy and REcoin never purchased any real estate, either before, during, or after the REcoin ICO, with the proceeds of the REcoin ICO or otherwise. It was simply not true that REcoin investments were backed or secured by real estate investments, or that the REcoin ICO investment could appreciate in value by virtue of the (nonexistent) real estate investments.

41.     Second, to give the appearance that the REcoin token was popular and the REcoin ICO successful, a "counter" near the top of the REcoin website stated, as of late August and early September of 2017, that over 2.8 million "REC" had been "already purchased."

42.     Assuming this statement incorporates the REcoin ICO initial 15% discount, it implies that the REcoin ICO had raised at least $2.3 million dollars.

43.     But this statement was false. At most, REcoin had obtained approximately $300,000 in funds from investors.

44.     Third, both the REcoin website and the REcoin Whitepaper stated that "REcoin is led by an experienced team of brokers, lawyers, and developers and invests its proceeds into

global real estate based on the soundest strategies." Moreover, this "team" was supposed to "ensure that all investment activities will be in the interest of RE coin holders and centered around the most profitable forms of real estate" such that they would "invest[] into properties with a stable income, short sales, foreclosures and real estate development" and that while "[n]o dividends are paid out to any beneficiaries . . . 100% of the net profit from REcoin is reinvested into real estate, minus expenses, and maintenance."

45.     In reality, as Zaslavskiy has testified, he never consulted, let alone hired, any broker, lawyer, or developer to engage in the supposed real estate investments. REcoin is "led" by no one other than himself.

46.     Fourth, under a heading entitled "Technical Specifications," the REcoin website touted the use of blockchain technology by stating that Ethereum cryptocurrency is used, "which means the following options: 1. Use of blockchain technology. 2. The possibility of mining . . . 3. The ability to create and use smart contracts."

47.     The REcoin Whitepaper contained similar statements. It specified, for example, that REcoin is a cryptocurrency "powered by blockchain technology," that REcoin tokens are "digital currencies which use cryptography for their security," that the "management of the REcoin supply and its security is guaranteed through the latest blockchain cryptocurrency technology," and that "[t]he most unique feature of REcoin is smart contracts."

48.     In reality, contrary to Zaslavskiy's and REcoin's misstatements about the nature of the offering in the REcoin ICO, investors who transferred funds to Zaslavskiy via the REcoin website never received any form of digital asset, token, or coin, and no token or coin for REcoin has ever been developed.

11

49.     Individuals who transferred funds to Zaslavskiy during the REcoin ICO were given nothing—certainly not a designation of any purported REcoin token on any blockchain. No mining was available, no smart contracts were available, and no cryptography backed individuals' purchase of REcoin.

50.     Fifth, under a heading entitled "Our Guarantees," the REcoin website promised investors, among other things, that "REcoin's activities are in full compliance and governed by United States law." The REcoin Whitepaper made a similar statement.

51.     In reality, Zaslavskiy, who has never practiced law and does not purport to have any knowledge about securities laws or any other legal regimes, had no basis for making the foregoing "guarantee." Indeed, Zaslavskiy admits he never even consulted an attorney to ensure REcoin's actual compliance with any applicable United States laws.

52.     Some of the foregoing false statements were repeated by Zaslavskiy and REcoin in press releases and other postings on the Internet starting as early as July 7, 2017. For example, different REcoin press releases falsely stated that: (1) REcoin is "backed by real estate;" (2) REcoin will be "managed, tracked and authenticated through blockchain technology;" (3) "[A]n international team of attorneys and programmers have been working tirelessly on creating solutions for REcoin holders;" and (4) the above efforts would "inevitably lead to the exponential increase of the REcoin's investment potential."

53.     On August 9, 2017, two days into the launch of the REcoin ICO, Zaslavskiy and REcoin issued a press release once more falsely stating, among other things, "we've raised over $1.5 million in direct REcoin token purchases [and] [a]nother $2.3 million is the projected earnings from real estate deals that are on the table as a result of the REcoin ICO success."

54.     As explained above, through the foregoing false and misleading statements, Zaslavskiy and REcoin obtained at least $300,000 from over a thousand investors during the REcoin ICO.

55.     Zaslavskiy and REcoin have also misled investors about REcoin's purported "social orientation." The REcoin website, for example, states that 2% of annual mining transaction fees will go to LLL, without disclosing that this "charity" is owned and controlled by Zaslavskiy himself. The REcoin Whitepaper similarly states that 2% of "[f]unds emitted [sic] during the mining process" will be sent to "charitable organizations" such as LLL (again without disclosing that this is Zaslavskiy's corporation) and the Red Cross or the Save the Children Foundation, and adds that "[u]p to 70% of the profit from REcoin is dedicated to a range of different charities and is written into the program code," even though there is no program code and therefore no specification to donate any (nonexistent) profits to any charity.

56.     The staff of the Commission's Division of Enforcement first contacted Zaslavskiy to answer questions, on a voluntary basis, about the REcoin ICO on August 15, 2017.

57.     Although the REcoin Whitepaper was substituted on the REcoin Website for another version that omits some of the REcoin Whitepaper's false statements on approximately August 17, 2017, the REcoin Website and new whitepaper continued and continues to make some of the above-described misrepresentations to investors. No correction or retraction has been issued with respect to any of these false statements.

**Defendants Fraudulently Raise Funds During the Diamond ICO.**

58.     Starting in approximately July 2017, Defendants began to market Diamond, noting that the "basis for the Diamond Reserve Club tokenized membership is the ownerships of Diamond Reserve Coin (DRC), which is hedged by physical diamonds."

13

59.     Zaslavskiy launched a website for Diamond with the URL https://drc.world, which contained a link to a whitepaper for the Diamond ICO (the "Diamond Whitepaper"), and which permitted users who entered an email address and created a password to "BUY DRC" by using their credit cards or digital currency.

60.     Defendants issued a series of news releases and Internet postings with respect to the Diamond ICO. For example, on August 31, 2017, Zaslavskiy and Diamond announced on the Diamond website the "Start of IMO for DRC" and that they were "super excited to bring you this news today: the Initial Membership Offering (#IMO) for the long-awaited Diamond." The announcement linked to a Facebook post announcing the Diamond ICO for September 7.

61.     Defendants also posted on the social news and discussion website Reddit a release dated September 11, 2017, entitled an "official statement" by the "founder and CEO of REcoin," announcing the purported end of the REcoin ICO and the conversion of a REcoin token into a Diamond token (the "September 11 Release").

62.     The supposed benefits of "membership" in the Diamond "club" were not clearly defined in the various communications with potential and actual investors in Diamond. In one post on the Internet, purchasers of the Diamond coin were promised a "range of opportunities available" and that purchasing more of the Diamond coin would "unlock access to more online and offline platforms, get greater discounts and specials, henceforth increasing the value of the DRC token as a whole." The Diamond Whitepaper and the September 11 Release provided: "Clearly stated, the goals of the Diamond Reserve Club are: to offer unique opportunities and benefits . . . ; to indefinitely prolong the lifespan and development of the Diamond Reserve Coin to increase its liquidity, visibility, enhance its credibility worldwide; to propagate the DRC as a new blockchain based proprietary instrument . . . ."

14

63.    Defendants tried to distinguish this supposed "IMO" from an ICO or an IPO. For example, in a Facebook post they stated that "IMO is a brand new instrument of facilitating tokenized membership in a digital community or a club. Although, it appears to be similar to ICO or IPO, the similarities are scarce, if not nonexistent."

64.    But these distinctions were a sham. For example, that same Facebook post stated that the membership is "tokenized through Diamond Reserve Coin, which is hedged by real physical diamonds," much like the REcoin token was supposedly backed by real estate.

65.    Additionally, as they explained with respect to the REcoin token or coin, Defendants similarly explained in the September 11 Release and other press releases, as well as in the Diamond Whitepaper, that the Diamond "token is powered by blockchain technology."

66.    Defendants also offered potential Diamond ICO investors a "discount scheme," similar to the REcoin ICO discount scheme, such that investors purchasing the coin during the first stage of the Diamond ICO would receive a 15% discount and thus pay $0.85 in U.S. dollars for one coin. As it did for the REcoin ICO, the discount scheme provided for lessening discounts as Diamond's ICO raised above certain threshold levels, until the close of the Diamond ICO, at which point one token would be worth, at least initially, $1.

67.    The September 11 Release stated that "members" of the "club" were "entitled to all the opportunities and benefits they were promised at the time of joining the REcoin community" and that "as the [sic] 'Led Zeppelin' would put it, 'The Song Remains the Same.'"

68.    As discussed further below, the September 11 Release began with a false description of the amounts raised during the REcoin ICO, and with a false description of the reasons why Defendants were stopping the REcoin ICO. It went on to offer individuals who had

15

invested in the REcoin ICO either a refund of their investment, or to convert their purported REcoin token into a Diamond coin at a discount.

69.     The September 11 Release "encourage[d] [investors] to stay with the project and watch your tokens, so to speak, turn into diamonds," by offering a "10% bonus in DRC."

70.     The September 11 Release promised investors access "to the Club's most valuable partnering platform – the 101Lego creative communications holding with all of its know-how available to you on all of the holding's 18 (eighteen platforms)" and that investors "get to draw from the well of wisdom end [sic] experience of the 101Lego's stellar staff of professionals, its extensive client list is at your disposal, its affiliate partners are waiting for your call." However, Lego does not have and has never had any business operations, let alone any staff of professionals or wells of wisdom of experience.

71.     The Diamond Whitepaper promised investors that a group "led by industry experts" would be formed to, among other things, ensure that all "diamonds are purchased at the best possible price" and "perform strategic sale/purchase transactions which would benefit the DRC, where 100% of the profit is reinvested back into diamonds."

72.     According to Zaslavskiy's testimony, Defendants will use 70% of the proceeds from sales of the Diamond ICO to invest in diamonds, and the rest to grow the business of Diamond. The Diamond Whitepaper explained that Diamond has the right to take actions such as "[c]reation and development [sic] the Diamond Reserve Club's infrastructure."

73.     The investments offered during the Diamond ICO were "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

74.     In the Diamond website, the Diamond Whitepaper, and the September 11 Release, as well as in a series of other releases posted on the Internet and in e-mails sent directly to individuals, Defendants made a series of false or misleading representations and omissions to potential and actual investors in the REcoin ICO and in the Diamond ICO.

75.     First, the Diamond Whitepaper touted the desirability and safety of investing in Diamond by noting that the Diamond coin "is hedged by physical diamonds which are stored in secure locations in the United States and are fully insured for their value." The September 11 Release similarly stated that the diamonds are "especially stored in secure locations in the United States and fully insured for their full value."

76.     In reality, just as the statements that REcoin was backed by real estate were false, the foregoing representations are false. Defendants have not purchased any diamonds, have not even identified any storage location, and there is no insurance on the non-existent diamonds.

77.     Second, the September 11 Release touted the supposed success and popularity of the REcoin ICO by reiterating the false statement made in prior releases that, after the REcoin ICO began on August 7, "over $1.5 million in direct REcoin token purchases [were made]." The September 11 Release then stated that "another $2.3 million in expected earnings . . . generated as a result of the REcoin pre-sale success."

78.     In reality, as Zaslavskiy now admits, he raised approximately $300,000 from the REcoin ICO.

79.     Third, the September 11 Release explained that after the initial supposed success of the REcoin ICO, "the US government did what it does best – interfered," and that "[i]n no uncertain terms, it let [Defendants] know that [Defendants are] not allowed to take steps to maintain the level of liquidity of our real estate holdings to keep your investments safe . . . ."

17

80. These statements were false. As Zaslavskiy has testified, he shut down the REcoin ICO not because of any contact with the U.S. Government or any governmental interference, but because he knew that promising investors a "hedged" token backed by real estate was not feasible because of the illiquidity of real estate.

81. Fourth, the Diamond website, Whitepaper, and September 11 Release touted the use of blockchain technology and encryption to secure investors' purchases of Diamond coins, as well as the availability of mining opportunities, just as Defendants touted the supposed use of blockchain technology and the availability of mining during the REcoin ICO.

82. These statements were false because no token or coin for Diamond has ever been developed and individuals who transferred funds to Zaslavskiy during the Diamond ICO were given nothing—certainly not a designation of any purported Diamond coin token on the blockchain. Moreover, no mining was available, and no cryptography backed individuals' purchases of Diamond coin.

**Continued and Additional Harm to Investors Is Threatened**

83. Zaslavskiy is in the process of launching or has already launched up to eighteen different websites, including the Logo website, to market and promote the sale of the Diamond coins in the Diamond ICO, and Zaslavskiy is sending frequent e-mails to investors about purchasing Diamond "tokens."

84. Users who wish to invest in Diamond are required to register in the Diamond website by providing an email address. Once a user does so, he or she receives periodic communications from Defendants, from a sender called "Max from DRC."

85. In these communications, Defendants attempt to induce investors to purchase the Diamond token by stating, for example, that they "forecast a minimum growth of 10% to 15%

per year. Please note that this is the minimum forecast. Judging by the number of applications we receive daily, these numbers are not the limit."

86.     In a recent e-mail, Defendants said that "DRC is growing by the hour!" and that they were launching a referral program given "the recent rush of new applications." Another e-mail urges investors to "BUY DRC" and stated Defendants "are negotiating with different exchanges, so you will be able to trade DRC on external exchanges and make more profit."

87.     Both the REcoin website and the Diamond website are live today, and investors may currently still transfer funds through the Diamond website.

88.     Defendants are thus continuing to solicit investors and their fraud is ongoing.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c)
### (All Defendants)

89.     The Commission repeats and realleges paragraphs 1 through 88 of its Complaint.

90.     By virtue of the foregoing, the Defendants, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit.

91.     By virtue of the foregoing, the Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) [17 C.F.R. § 240.10b-5(a)-(c)], promulgated thereunder.

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(1)-(3)
### (All Defendants)

92.     The Commission realleges and incorporates by reference paragraphs 1 through 88, as though fully set forth herein.

93.     By virtue of the foregoing, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, Defendants: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

94.     By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Securities Act Section 17(a)(1)-(3) [15 U.S.C. § 77q(a)(1)-(3)].

## THIRD CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act
### (All Defendants)

95.     The Commission realleges and incorporates by reference paragraphs 1 through 88, as though fully set forth herein.

96.     By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus, and (b) made use of the means and instruments of

transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement had been filed.

97.     By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and e(c)].

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting REcoin's and Diamond's Violations of Sections 5(a), 5(c), and 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder (Zaslavskiy)**

98.     The Commission repeats and realleges paragraphs 1 through 88 of its Complaint.

99.     By virtue of the foregoing, Defendant Zaslavskiy provided knowing or reckless substantial assistance to REcoin and Diamond, which, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, to make untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and without a registration statement in effect as to that security, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus.

100.     By virtue of the foregoing, Zaslavskiy aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Sections 5(a), 5(c), and 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1)-(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) [17 C.F.R. § 240.10b-5(a)-(c)] promulgated thereunder, in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court grant the following relief:

### I.

An Order temporarily and preliminary, and a Final Judgment permanently, restraining and enjoining the Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with each of them who receive actual notice of the injunction by personal service or otherwise from any future direct or indirect participation in any offering of unregistered securities, from any future violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(c)], and from any future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] issued thereunder;

### II.

An Order temporarily and preliminarily freezing all of Defendants' assets;

### III.

An Order temporarily and preliminarily enjoining and restraining Defendants, and any person or entity acting at their direction or on their behalf, from destroying, altering, concealing or otherwise interfering with the access of the Commission to relevant documents;

### IV.

An Order temporarily and preliminarily directing the repatriation of any assets Defendants may have transferred abroad;

### V.

An Order providing that the Commission may take expedited discovery;

**VI.**

An Order directing Defendants to file with this Court and serve upon the Commission, within three (3) business days, or within such extension of time as the Commission staff agrees to, a verified accounting, signed by each Defendant, and under penalty of perjury;

**VII.**

An Order directing Defendant Zaslavskiy to surrender to the Clerk of the Court all passports that he holds and prohibiting him from traveling outside the United States until such time as the Court finds that he has provided a verified accounting and repatriated assets;

**VIII.**

A Final Judgment directing each of the Defendants to disgorge all ill-gotten gains, including prejudgment interest thereon;

**IX.**

A Final Judgment permanently barring Defendant Zaslavskiy from serving as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

**X.**

A Final Judgment prohibiting Defendant Zaslavskiy from participating in any offering of digital securities;

**XI.**

A Final Judgment directing the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## XII.

Such other and further relief as this Court deems just and appropriate.

Dated: New York, New York
September 29, 2017

SECURITIES AND EXCHANGE COMMISSION

By: _____
     Andrew M. Calamari
     Regional Director

     Lara S. Mehraban
     Valerie A. Szczepanik
     Jorge G. Tenreiro
     Pamela Sawhney
     200 Vesey Street, Suite 400
     New York, New York 10281-1022
     (212) 336-9145 (Tenreiro)
     Email: TenreiroJ@sec.gov
     Attorneys for Plaintiff

## XII.

Such other and further relief as this Court deems just and appropriate.

Dated: New York, New York
       September 29, 2017

SECURITIES AND EXCHANGE COMMISSION

By: _____
       Andrew M. Calamari
       Regional Director

       Lara S. Mehraban
       Valerie A. Szczepanik
       Jorge G. Tenreiro
       Pamela Sawhney
       200 Vesey Street, Suite 400
       New York, New York 10281-1022
       (212) 336-9145 (Tenreiro)
       Email: TenreiroJ@sec.gov
       Attorneys for Plaintiff