CV17-    5725

DEARIE, J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,          :

                              Plaintiff,     :          17 Civ.        (   )

         - against -                         :          ECF Case

RECOIN GROUP FOUNDATION, LLC, DRC            :
WORLD INC. a/k/a DIAMOND RESERVE CLUB,       :
and MAKSIM ZASLAVSKIY,                        :

                              Defendants.    :
-----------------------------------------------------------------x

REYES  M.J.

2017 SEP 29  PM 2: 27

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

FILED
CLERK

## DECLARATION OF VALERIE A. SZCZEPANIK

I, Valerie A. Szczepanik, pursuant to 28 U.S.C. § 1746, declare as follows:

1.       I am a member of the Bar of the State of New York and of this Court.

2.       I am employed as an Assistant Regional Director in the New York Regional

Office of Plaintiff United States Securities and Exchange Commission ("Commission"),  I

submit this declaration in support of the Commission's emergency *ex parte* application (the

"Application") for an Order to Show Cause, Temporary Restraining Order, and Order Freezing

Assets and Granting Other Relief against Defendants REcoin Group Foundation, LLC

("REcoin"), DRC World, Inc. a/k/a Diamond Reserve Club ("Diamond"), and Maksim

Zaslavskiy ("Zaslavskiy").

3.       I make this Declaration based upon personal knowledge, information and belief.

The sources of my information and the bases of my belief are documents obtained by the staff of

the Commission's Division of Enforcement (the "Staff") and information provided to me by

other members of the Staff.  This information includes the sworn testimony of Defendant

Maksim Zaslavskiy, taken pursuant to a Commission Formal Order of Investigation and an

administrative subpoena issued under that authority, on September 20, 2017.  A true and correct

copy of a transcript of that testimony is appended hereto as Exhibit A.  Because the Commission

submits this Declaration for the limited purpose of supporting the Application, I have not set

forth each and every fact that I know about this matter.

**Background on Digital Tokens or Coins**

    4.    An initial coin offering or "ICO" is a fundraising event in which an entity offers

participants a unique "coin" or "token" in exchange for consideration (often in the form of

virtual currency[1]—most commonly Bitcoin and Ether—or fiat currency).

    5.    The tokens are issued on a "blockchain" or cryptographically secured ledger.[2]

    6.    The token may entitle its holders to certain rights related to a venture underlying

the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the

issuer, and/or voting rights.  These tokens may also be listed on online platforms, often called

---

[1]    The Financial Action Task Force, an inter-governmental agency that promotes laws combating anti-money laundering and in which the United States is a member, describes virtual currency as a "digital representation of value that can be digitally traded and functions as (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status . . . in any jurisdiction."

[2]    A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called blocks.  Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain.  The system relies on cryptographic techniques for secure recording of transactions.  A blockchain can be shared and accessed by anyone with appropriate permissions.  The Bitcoin blockchain is an example of a "non-permissioned," or public and open access blockchain.  Anyone can download the Bitcoin open-source software and join.  All participants share a single view of the Bitcoin blockchain, which is updated when Bitcoin network participants reach a consensus on the validity of transactions under review.  "Permissioned" or private blockchains are modifications to that model and require permissioned servers to be approved to participate on the network or to access particular information on the blockchain.  Blockchains or distributed ledgers can also record what are called smart contracts, which essentially are computer programs designed to execute the terms of a contract when certain triggering conditions are met.

virtual currency exchanges, and tradable for virtual or fiat currencies. Often, the tokens are immediately tradable.

7.      ICOs are typically announced and promoted through public online channels. Issuers usually release a "whitepaper" describing the project and the terms of the ICO. To participate, investors are generally required to transfer funds (often virtual currency) to the issuer's address, online wallet, or other account. After the completion of the ICO, the issuer will distribute its unique "tokens" to the participants' unique address on the blockchain.

**Zaslavskiy and REcoin Promote and Obtain Funds During the REcoin ICO**

8.      Zaslavskiy incorporated REcoin as a Nevada limited liability company on July 26, 2017. Attached hereto as Exhibit B is a true and correct copy of the REcoin certificate of incorporation filed with the Nevada Secretary of State.

9.      Zaslavskiy began marketing REcoin "tokens" at least as early as July 7, 2017, announcing the REcoin ICO as scheduled for August 7 through October 9, 2017, and stated in a press release that the "proceeds from the initial sale of tokens will be invested in the highly regulated real estate market" and that REcoin will be "managed, tracked and authenticated through blockchain technology" and that an "international team of attorneys and programmers have been working tirelessly on creating solutions for REcoin holders to allow them to enter smart contracts in real estate . . . ." Attached hereto as Exhibit C is a true and correct copy of a July 7, 2017, press release containing the foregoing statements, and listing "Maksim Zaslavskiy" under "Contacts" as "Founder" of "REcoin Group." A copy of the press release is also accessible on the Internet as of September 29, 2017, at http://www.businesswire.com/news/home/20170707005526/en/.

10.     Since at least July 28, 2017, REcoin and Zaslavskiy have posted on REcoin's website, https://101recoin.com, a whitepaper describing the terms of the REcoin ICO. A true and correct copy of the version of the whitepaper that the Staff downloaded from REcoin's website on or around July 28, 2017, is attached hereto as Exhibit D. (The "First REcoin Whitepaper.")

11.     During the September 20, 2017 investigative testimony of Zaslavskiy, the Staff marked as Exhibit 4 of its investigation a black and white copy of the First REcoin Whitepaper. A true and copy of Exhibit 4 of the investigation is submitted hereto as Exhibit E.

12.     The First REcoin Whitepaper stated, among other things, that:

    (a) "REcoin is backed by real estate investments in countries with a developed and stable economy such as the United States, Canada, the U.K., Switzerland, Japan." Ex. D at 02;

    (b) "REcoin is a new cryptocurrency powered by blockchain technology offering stability ... ." Id. at 04;

    (c) "The value of the [REcoin] currency can grow at least two ways: through the steady increasing value of the real estate investments that REcoin is used to purchase, and a higher REcoin value when the demand for REcoin rises." Id. at 05;

    (d) "REcoin holders are not just investors, they are also users. REcoin offers an attractive investment opportunity . . . ." Id. at 06;

    (e) "The most unique feature of REcoin is smart contracts." Id. at 07;

    (f) "The 101REcoinTrust is designed to ensure that all investment activities will be in the interest of REcoin holders and centered around the most

profitable forms of real estate.  REcoin is led by an experienced team of brokers, lawyers, and developers and invests its proceeds into global real estate based on the soundest strategies, including:  [] Investment into properties with stable income, short sales, foreclosures and real estate development in the world's leading economies.  [] No dividends are paid out to any beneficiaries, meaning that 100% of the net profile from ReCoin [sic] is reinvested into real estate." Id. at 08; and

(g) "REcoin offers several guarantees to its users to protect their investment: [] REcoin's activities are in full compliance and governed by United States law.  [] 100% of our proceeds from REcoin sales minus maintenance costs are invested into real estate . . . .  The REcoin Purse is secured by the latest cryptocurrency tools and designed to be user-friendly and convenient." Id. at 09.

13.    REcoin posted similar statements as those in the First REcoin Whitepaper in other parts of the Internet, including, for example, in the social news aggregator site known as Reddit. Attached hereto as Exhibit F is a true and correct copy of a Reddit post made by "101REcoin" on or about July 10, 2017, containing statements similar to those outlined in paragraph 12(a)-(e) and 12(g).

14.    Submitted herewith as Exhibit G is an image of the homepage of REcoin's website as of August 3, 2017, the eve of the commencement of the REcoin ICO, obtained from the Internet archives website and available at https://web.archive.org/web/20170803023116/https://101recoin.com (the "August 3 Website").

15.     The August 3 Website made similar statements to those made by the First REcoin Whitepaper, as set forth in paragraph 12 above, including that:

(a) "[r]eal estate backs REcoin in countries with a [sic] developed and stable economies [sic] such as the United States, Canada, the U.K., Japan and Switzerland." Ex. G at 2;

(b) "REcoin's activities are in full compliance and governed by United States law." Id. at 3;

(c) "The 101REcoinTrust is designed to ensure that all investment activities will be in the interest of REcoin holders . . . ; REcoin is led by an experienced team of brokers, lawyers, and developers, and invests its proceeds into global real estate based on the soundest strategies ... ." Id. at 4; and

(d) "Ethereum cryptocurrency code is used, which means the following options: 1. Use of blockchain technology. 2. The possibility of mining ... 3. The ability to create and use smart contracts." Id. at 7.

16.     The August 3 Website also spoke of Zaslavskiy's supposed "extensive expertise in real estate" and noted that "[h]aving extensive background in investment management and community service, it was obvious choice [sic] to join the investors and real estate entrepreneurs." Id. at 6.

17.     A document Zaslavskiy provided the Staff, and which he alleges was distributed on the Internet, states, "[A]t some point you're going to have to secure your investment. And that's the problem RECoin [sic] is going to address. Personally, I'm 100% certain that there's simply no other way than backing RECoin [sic] with real estate." A copy of this document

appears to have been written before August 3, 2017, and a true and correct copy of the version Zaslavskiy provided to the Staff is submitted hereto as Exhibit H. See also Ex. A at 10:21-11:12 (describing the documents Zaslavskiy provided to the Staff).

18.     Starting on August 7, visitors to the REcoin website could click on one of several buttons to "BUY RECOIN," which, after requiring a user to enter an email and create a password, upon information and belief, would permit them to transfer funds via digital currency such as Bitcoin or Ethereum, direct bank transfer, or online payment processing services such as PayPal. A true and correct copy of a press release of unknown date, provided to the Staff by Zaslavskiy, describing these payment methods is attached hereto as Exhibit I.

19.     The REcoin ICO offered purchasers a discount such that those purchasing during the sale of the first ten million of "REC" would pay $0.85 per unit, with decreasing discounts applying to future sales tranches. Attached hereto as Exhibit J is a true and correct copy of a Reddit post made by "101REcoin" on or around July 12, 2017, describing the foregoing "discount scheme," and downloaded by the Staff from Reddit.

20.     In a document Zaslavskiy provided the Staff and which he alleges was distributed on the Internet, Zaslavskiy and REcoin stated, among other things, that an entity called the REcoin trust "is exercising legal and financial control over the actions of the company management, which is consistent with the United States business practice[,]" and that this structure "allows expecting investment profitability from 9% and up to 67% per year." Attached hereto as Exhibit K is a true and correct copy of the document referred to herein and provided by Zaslavskiy to the Staff. See also Ex. A at 10:21-11:12 (describing the documents Zaslavskiy provided to the Staff).

21.     On August 9, 2017, two days after the launch of the REcoin ICO, Zaslavskiy and

REcoin issued a press release, widely available throughout the Internet, entitled "REcoin ICO is

a hit from the start: the first ever crypto currency hedged by real estate is selling out in droves."

(The "August 9 Release"). The August 9 Release touts the supposed success of the ICO. A true

and correct copy of one version of this press release, bearing both REcoin's and Zaslavskiy's

names, is attached hereto as Exhibit L, was obtained from the Staff from the Internet, and is

publicly accessible on the Internet as of September 29, 2017, at

http://www.khq.com/story/36101908/recoin-ico-is-a-hit-from-the-start-the-first-ever-crypto-

currency-hedged-by-real-estate-is-selling-out-in-droves.

22.     The August 9 Release naming REcoin and Zaslavskiy, stated, among other things,

that REcoin "is proving to be a raging success," and that since the launch of the ICO, "we've

raised over $1.5 million in direct REcoin token purchases" and that "Another $2.3 million is the

projected earnings from real estate deals that are on the table as a result of the REcoin ICO

success." Ex. L at 1.

23.     The First REcoin Whitepaper remained on the REcoin website for approximately

one and a half to two weeks after the beginning of the REcoin ICO on August 7, 2017, at which

point it was substituted for a different one (the "Second REcoin Whitepaper," together with the

First REcoin Whitepaper the "REcoin Whitepapers"). A true and correct copy of the Second

REcoin Whitepaper is attached hereto as Exhibit M, which was marked as Exhibit 8 of the

investigative testimony. Ex. A at 155:6-18 (investigative testimony of Zaslavskiy referring to

Exhibit 8 and describing the removal of the First REcoin Whitepaper for the Second REcoin

Whitepaper).

24.    The Second REcoin Whitepaper contained similar statements as the First, including that:

    (a) "REcoin is hedged by secure real estate investments in the world's most advanced economies." Ex. M at 2;

    (b) "REcoin is powered by blockchain technology … ." Id. at 5;

    (c) a purchaser could "exchang[e] tokens for Trust assets, whose stable earning potential is based on investing in the propitious real estate in developed countries." Id. at 6; and

    (d) that the "Trust is led by an experienced team of brokers, attorneys, and developers and invests its proceeds into global real estate based on the soundest strategies" including "[u]sing active investment strategies" and reinvesting income. Id. at 9.

25.    The REcoin website was also modified after August 3, and, at least as of September 4, 2017, contained many of the same statements as the August 3 Website, including those set forth above in paragraphs 15(a)-(d) and 16. A true and correct copy of the REcoin website as of September 4 (the "September 4 Website"), which the Staff obtained from Internet archives and is available at https://web.archive.org/web/20170904221613/https://101recoin.com/en, is attached hereto as Exhibit N.

26.    The September 4 Website also had a counter feature, purporting to show that "2 894 367 REC" had already been purchased, Ex. N at 1, which, using REcoin's stated discount scheme of 85%, implies approximately $2.46 million in funds raised.

27.     Attached hereto as Exhibit O is a version of the REcoin website dated as of September 18, 2017, downloaded by Commission Staff and used by the Staff as Exhibit 3 during Zaslavskiy's administrative testimony (the "September 18 Website," together with the August 3 Website and the September 4 Website, the "REcoin Websites.") The September 18 Website contains similar statements as paragraphs 15(a)-(d) and 16, above. See Ex. O. The September 18 Website contains a counter feature purporting to show that 2 894 367 REC had been purchased, Ex. O at 1, which, using REcoin's supposed discount scheme of 85%, implies approximately $2.46 million in funds raised.

28.     In investigative testimony, Zaslavskiy admitted to having raised approximately $300,000 from approximately one thousand investors during the REcoin ICO, including some in the United States. Ex. A at 27:18-23; 28:3-7.

**Zaslavskiy Admits He and REcoin Lied to Investors During the REcoin ICO**

29.     Zaslavskiy has testified under oath and admitted the foregoing statements in the REcoin Whitepapers, the REcoin Websites, and the August 9 Release are not true. For example:

(a) When the Staff asked Zaslavskiy, "it's not accurate that the value of the REcoin was going to grow through the steady increase in value of the real estate?" he answered: "Of course not." Ex. A at 123:1-4; see also id. at 120:15-121:4 (describing language as a "screw-up"); 126:9-23;

(b) When the Staff asked whether the statement "REcoin is led by an experienced team of brokers, lawyers and developers and invested proceeds into global real estate based on the sound of strategies" was accurate at the time the First REcoin Whitepaper was on the website,

Zaslavskiy responded: "No." Ex. A at 129:12-130:6; see also id. at 83:14-87:7; 131:12-24;

(c) When the Staff asked Zaslavskiy the basis for the statement that REcoin is "in full compliance" with United States law, he averred that the basis for that statement was his own belief. Ex. A at 131:8-132:7;

(d) Zaslavskiy admitted that purchasers of REcoin did not obtain anything in exchange for their purchase, including nothing in their digital accounts, but instead that he simply kept a log of their purchase on his computer, and that no token was ever developed. Ex. A at 12:7-8; 12:22-25; 76:2-78:11. Thus, there was no "blockchain" technology backing the purchases;

(e) When asked about the statements that "real estate backs REcoin," Zaslavskiy admitted that no real estate had ever been purchased. Ex. A at 61:1-9; and

(f) Zaslavskiy admitted that he had raised, at most, approximately $300,000 during the REcoin ICO, and that contrary representations were not correct. Ex. A at 25:7-24.

**Defendants Halt the REcoin ICO and Launch the Diamond ICO**

30.    The Staff first contacted Zaslavskiy to request that he provide, on a voluntary basis, information about the REcoin ICO on August 15, 2017.

31.    Despite his earlier statement that "Personally, I'm 100% certain that there's simply no other way than backing REcoin [sic] with real estate," supra ¶ 17, Zaslavskiy now

avers that backing REcoin with real estate was "not possible" and that in his experience "all

that's happening with real estate, that's a scam." Ex. A at 100:3-101:12.

32.     On September 6, 2017, Defendants announced that they were "switching

strategies" from backing their offering with real estate to backing it with diamonds. A true and

correct copy of a press release entitled, "REcoin Group rethinks hedging strategy, drops real

estate in favor of physical diamonds[,]" obtained by the Staff from the Internet is attached hereto

as Exhibit P. The press release described: "All REcoin holdings will be seamlessly converted

into Diamond Reserve Coin (DRC) at the rates favorable to REcoin investors" and that "the

DRC holders are now going to be able to use smart contracts not only in real estate but in every

facet of commerce, in which the community is going to be engaged."

33.     A new ICO was to be conducted by an entity called "Diamond Reserve Club,"

which Zaslavskiy incorporated under the name DRC World, Inc., as a corporation under the laws

of Puerto Rico on September 1, 2017. Attached hereto as Exhibit Q is a true and correct copy of

Diamond's "Certificate of Incorporation of a Stock Corporation," filed with the Puerto Rico

Department of State.

34.     Attached hereto as Exhibit R is a true and correct copy of the Diamond website.

On August 31, 2017, Zaslavskiy and Diamond posted on Diamond's website an announcement

about the "Start of IMO for DRC" and that "we're super excited to bring you this news today:

the Initial Membership Offering (#IMO) for the long-awaited Diamond ... ." Ex. R at 5.

35.     That August 31 post linked to a Facebook post of September 5, under "Diamond

Reserve Club," a copy of which is attached hereto as Exhibit S and which may be found at

https://www.facebook.com/800277530031834/photos/a.1214344271958489.1073741828.80027

7530031834/1533085713417675/?type=3, which announced the start of the Diamond IMO/ICO for September 7, 2017.

36.     Zaslavskiy and Diamond apparently tried to distinguish an "ICO" from an "IMO." For example, the Facebook post of September 5 stated, "IMO is a brand new instrument of facilitating tokenized membership in a digital community or a club. Although, it appears to be similar to ICO or IPO, the similarities are scarce, if not nonexistent." Ex. S at 1.

37.     However, the documents evidence little distinction. For example, on September 11, 2017, Defendants released a press release (the "September 11 Release"), which contained REcoin's and Diamond's logos as well as Zaslavskiy's name, explaining that they were shutting down the REcoin ICO and launching the Diamond ICO. A true and correct copy of a Reddit version of the September 11 Release is attached hereto as Exhibit T, and a true and correct copy of a document purporting to be the September 11 Release and produced to the Staff by Zaslavskiy and marked as Exhibit 7 during his administrative testimony, is attached hereto as Exhibit U.

38.     The September 11 Release stated, for example, that purchasers of a Diamond "membership" are "entitled to all the opportunities and benefits they were promised at the time of joining the REcoin community" and that "as the [sic] 'Led Zeppelin' would put it, 'The Song Remains the Same.'" Ex. U at 3; see also Ex. A at 61:19-62:3 (Zaslavskiy testifying that other than different hedging and duration of project, "[t]he rest is exactly the same").

39.     The September 11 Release, among other things, also stated that:

(a) "[j]ust as is REcoin, DRC is powered by blockchain technology ... ."

Ex. U at 3;

(b) purchasers of REcoin could get a refund for their purchase, but offered a 10% bonus for "conversion of your REcoin into DRC ... ." Id.; and

(c) the Diamond token would be hedged by diamonds "especially stored in secure locations in the United States and fully insured for their full value." Id. at 2;

40.     In explaining the reasons for stopping the REcoin ICO and launching the Diamond ICO, the September 11 Release stated that the REcoin ICO had been very popular, because "over $1.5 million in direct REcoin token purchases [were made]," and that "another $2.3 million in expected earnings were generated as a result of the REcoin pre-sale success[,]" but that, after that, "the US government did what it does best – interfered," and that "[i]n no uncertain terms, it let us know that we're not allowed to take steps to maintain the level of liquidity of our real estate holdings to keep your investments safe . . . ." Ex. U at 2.

41.     Zaslavskiy and Diamond also made available a whitepaper for Diamond (the "Diamond Whitepaper"), a copy of which is attached hereto as Exhibit V, and which the Staff downloaded from Diamond's website.

42.     Among other things, the Diamond White Paper tells potential investors that:

(a) Diamond will be "led by industry experts" and that a group would be formed to, among other things, ensure that "all diamonds are purchased at the best possible price" and "perform strategic sale/purchase transactions which would benefit the DRC, where 100% of the profit is reinvested back into diamonds." Ex. V at 6;

(b) Diamond was a membership club offering members benefits such as access to discounts and that "[c]learly stated, the goals of the Diamond

14

Reserve Club are: [] to offer unique opportunities and benefits . . . ; [] to indefinitely prolong the lifespan and development of the Diamond Reserve Coin to increase its liquidity, visibility, enhance its credibility worldwide; [and] to propagate the DRC as a new blockchain based proprietary instrument . . . ." Id. at 3; and

(c) Diamond has the right to "developing" the club by taking actions including "development [of] the Diamond Reserve Club's infrastructure . . . ." Id. at 4.

43.     Upon clicking on a button on Diamond's website that says "Log in" and entering a username and password, a user is directed to a page that permits him or her to purchase Diamond "tokens" via credit card, digital currency, or asset transfer service like Amazon Pay. A true and correct copy of a screenshot of this page is attached hereto as Exhibit W. This website was accessed by the Staff after providing the name "SEC Enforcement" and using a Commission-provided e-mail address.

44.     Upon registering in the Diamond website, which the Staff did on Thursday, September 21, 2017, the Staff received emails from sender "Max at DRC," generally encouraging the recipient to purchase Diamond "tokens." One such email, attached hereto as Exhibit X, stated "[a]s for the growth in the value of your DRC tokens, we forecast a minimum growth of 10% to 15% per year. Please note that this is the minimum forecast. Judging by the number of applications we receive daily, these numbers are not the limit. We are just saying 'Do not miss the moment!'" Ex. X at 1.

**Zaslavskiy Admits Defendants Lied to Investors During the Diamond ICO**

45.     Zaslavskiy has testified under oath and admitted to the Commission Staff that many of the foregoing statements made by Defendants in the Diamond Whitepaper, the Diamond website, and the September 11 Release, are false.

46.     For example:

(a) Zaslavskiy admitted that no one from the U.S. Government contacted him to shut down the REcoin ICO, but that he did that on his own volition, because it was "too risky" to invest in real estate. See Ex. A at 12:22-13:18; 151:3-22;

(b) As set forth in Paragraph 28(g), above, Zaslavskiy admitted that he raised at most $300,000 from investors during his REcoin ICO, nowhere near the millions claimed. See id. at 25:4-24;

(c) Zaslavskiy admitted that there are no diamonds and that he has not even identified a supposed location for them. Id. at 97:8-19; and

(d) Zaslavskiy admitted that there is not yet any cryptography or blockchain technology representing the supposed Diamond "memberships"; thus, purchasers of the DRC "membership" have received nothing in return. Id. at 55:5-16.

**Zaslavskiy's Threatens Continued Harm to Investors and to Depart the United States, Admits to the Destruction of Documents, and Resists Providing Documents to the Staff**

47.     The Staff first issued an administrative subpoena to Zaslavskiy and REcoin on September 14, 2017, asking for, among other things, communications with potential purchasers of REcoin. A true and correct copy of that subpoena is attached hereto as Exhibit Y.

48.     The subpoena required Zaslavskiy to produce certain documents by September 25, 2017, Ex. Y at 1, but, when Zaslavskiy appeared for testimony on September 20, he indicated he would not produce any documents related to "tokens" or "coins" because the REcoin interests were neither, despite repeated statements in the REcoin materials referring to the items as such. Ex. A at 11:1-12:21.

49.     Because Zaslavskiy refused to produce documents in response to the aforementioned subpoena, the Staff issued new subpoenas to Defendants requesting communications in connection with the potential purchase of any "asset" offered by REcoin or Diamond, on September 20, 2017.  A copy of the subpoena issued to Diamond is attached hereto as Exhibit Z, calling for the production of documents by September 25, 2017.  Defendants have not produced any documents in response to the subpoena.

50.     When the Staff asked Zaslavskiy the source of the funds for his ventures, he invoked the Fifth Amendment to the United States Constitution. Id. at 65:11-67:1.

51.     Both the REcoin Website and the Diamond Website are still live and the Second REcoin Website and Diamond Website are available to users on the Internet.  Diamond is currently accepting funds from investors. Ex. A at 58:20-59:2.

52.     Zaslavskiy has plans to launch additional websites that will have fund-raising interfaces, including one he calls "MLT Hub." See Ex. A at 114:12-115:15.

53.     Attached hereto as Exhibit AA is a true and correct copy of a press release the Staff obtained from the Internet, dated September 19, 2017, announcing the launch of "MLT Hub . . . by DRC World Inc." Ex. AA at 1.

54.    Zaslavskiy indicated to the Staff that he had been recently deleting emails from his Gmail account, Ex. A at 94:12-95:5, and had not kept copies of previous versions of files evidencing communications prepared for potential investors. Id. at 11:4-12; 36:21-25.

55.    Zaslavskiy indicated to the Staff that he travelled abroad three to four times last year, including to Ukraine and Russia, and including one trip that lasted "almost three months." Ex. A at 156:22-157:15.

56.    Zaslavskiy indicated to the Staff, on September 20, 2017, that he was going to be in Brooklyn for "the next [Jewish] holiday" but that after that he would be in Ukraine for "about a month or two." Ex. A at 179:11-23.

57.    Defendants have obtained at least approximately $25,000 in August 2017 alone from Amazon Pay, and those assets were immediately dissipated, as indicated by the August 2017 statement of one of Defendants' bank accounts, a true and correct copy of which is attached hereto as Exhibit BB.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 29, 2017
New York, New York

Valerie A. Szczepanik