CV17- 5725

DEARIE, J.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

REYES, M.J.

------------------------------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,                :
                                                   :
                              Plaintiff,           :      17 Civ.    (    )
                                                   :
            - against -                            :      ECF Case
                                                   :
RECOIN GROUP FOUNDATION, LLC, DRC                  :
WORLD INC. a/k/a DIAMOND RESERVE CLUB,             :
and MAKSIM ZASLAVSKIY,                             :
                                                   :
                              Defendants.          :

------------------------------------------------------------x

FILED
CLERK
2017 SEP 29  PM 2: 27
U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS *EX PARTE* EMERGENCY
APPLICATION FOR AN ORDER TO SHOW CAUSE, TEMPORARY RESTRAINING
ORDER, AND ORDER FREEZING ASSETS AND GRANTING OTHER RELIEF

Jorge G. Tenreiro
Valerie A. Szczepanik
Counsel for the Plaintiff
Securities and Exchange Commission
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-9145 (Tenreiro)

September 29, 2017

TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ..........................................................................................3

    I.      Background ..................................................................................................3

    II.     Zaslavskiy And ReCoin Defraud Investors In the Recoin ICO ....................................4

          A.  Zaslavskiy and ReCoin Tout the REcoin ICO Pre-Launch ................................4

          B.  Zaslavskiy and ReCoin Launch, and Continue to Tout the REcoin ICO ...............6

          C.  Zaslavskiy Admits He Defrauded Investors in the REcoin ICO ............................7

    III.    Defendants Defraud Investors In The Diamond ICO ..........................................8

          A.  The Purported Reasons For the REcoin Shutdown........................................8

          B.  The Ongoing, Fraudulent Diamond ICO ....................................................8

    IV.    Zaslavskiy's Ongoing Conduct and Contacts With The Commission Staff...............10

ARGUMENT ....................................................................................................11

    I.      Defendants Should Be Temporarily Restrained And Preliminarily Enjoined From Further Violations Of The Federal Securities Laws ..........................................11

          A.  The Interests Offered and Sold in the ICOs are Securities ..................................12

          B.  Defendants' Ongoing Offers and Sales of Unregistered Securities........................14

          C.  Defendants' Ongoing Violations of the Anti-Fraud Provisions ............................15

          D.  Defendants' Conduct is Ongoing............................................................19

    II.     The Court Should Freeze Defendants' Assets ..............................................20

    III.    Other Ancillary Relief Is Necessary ......................................................21

          A.  An Order to Repatriate Assets is Necessary ..............................................22

          B.  Defendants Should be Ordered to Provide An Accounting...................................23

C. Expedited Discovery and an Order Mandating Preservation of Documents is Appropriate ...................................................................................................................23

D. A *Ne Exeat* Order is Necessary.................................................................................24

CONCLUSION.................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC*, 446 U.S. 680 (1980) .................................................................. 15

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) .................................................... 17

*De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212 (1945) ................................. 21

*In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458 (S.D.N.Y. 2012), *aff'd*, No. 12–3859, 2013 WL 1982534 (2d Cir. May 15, 2013) ............................................. 16

*Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011) ............................ 16

*Pennaluna & Co. v. SEC*, 410 F.2d 861 (9th Cir. 1969) ....................................... 14-15

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) ........................................ 13

*SEC v. Benger*, No. 09-cv-676, Docket No. 18 (N.D. Ill. Feb. 3, 2009) ........................ 24

*SEC v. Bremont*, 954 F. Supp. 726 (S.D.N.Y. 1997) ........................................... 22

*SEC v. Cavanagh*, 1 F. Supp. 2d 337 (S.D.N.Y.), *aff'd*, 155 F.3d 129 (2d Cir. 1998)12, 14, 18, 19

*SEC v. Chemical Trust*, No. 00-8015, 2000 WL 33231600 (S.D. Fla. Dec. 19, 2000) ................ 22

*SEC v. Chinese Consol. Benev. Ass'n*, 120 F.2d 738 (2d Cir.1941) ............................ 14, 15

*SEC v. Commonwealth Chem. Secs. Inc.*, 574 F.2d 90 (2d Cir. 1978) .......................... 19

*SEC v. Compania Int'l Financiera S.A.*, 2011 WL 3251813 (S.D.N.Y. July 29, 2011) .......... 21-22

*SEC v. Culpepper*, 270 F.2d 241 (2d Cir. 1959) ............................................... 14

*SEC v. Edwards*, 540 U.S. 389 (2004) ........................................................... 12

*SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402 (S.D.N.Y. 2001) ........................ 20, 21

*SEC v. Hedén*, 51 F. Supp. 2d 296 (S.D.N.Y. 1999) ........................................... 20

*SEC v. Illarramendi*, 2011 WL 2457734 (D. Conn. 2011) ....................................... 22

*SEC v. Int'l Swiss Inv. Corp.*, 895 F.2d 1272 (9th Cir. 1990) ................................ 22

*SEC v. Int't Chem. Dev. Corp.*, 469 F.2d 20 (10th Cir. 1972) ................................ 14

iv

*SEC v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011) ......................................................... 18

*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972)................................. 17, 27, 22

*SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998) ................................................................. 16

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) ........................................... 11, 18

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) ................................................................ 14

*SEC v. Musella*, 578 F. Supp. 425 (S.D.N.Y. 1984) ...................................................... 19

*SEC v. North Am. Research & Dev. Corp.*, 424 F.2d 63 (2d Cir. 1970) .......................... 14

*SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279 (2d Cir. 2013).............................. 15

*SEC v. Private Equity Mgmt. Group*, No. CV 09-2901, 2009 WL 1310984
    (C.D. Cal. Apr. 27, 2009).......................................................................................... 24

*SEC v. Resource Development Int'l, LLC*, 3:02-cv-0605, Docket No. 9 (N.D. Tex. Mar. 25,
    2002) ........................................................................................................................ 24

*SEC v. Reynolds*, C.A. No. 3:08-CV-438-B, 2011 WL 16903395 (N.D. Tex. Mar. 16, 2011).... 24

*SEC v. Roth*, No. 11-cv-2079, Docket No. 9 (N.D. Ill. Mar. 21, 2011)............................ 24

*SEC v. Softpoint, Inc.*, 958 F. Supp 846 (S.D.N.Y. 1997) ............................................. 15

*SEC v. Spongetech Delivery Sys., Inc.*, No. 10-cv-2031, 2011 WL 887940
    (E.D.N.Y. Mar. 14, 2011) ......................................................................................... 22, 23

*SEC v. Suter*, 732 F.2d 1294 (7th Cir. 1984) ................................................................. 19

*SEC v. Tecumseh Holding Corp.*, No. 03 Civ. 5490 (SAS), 2009 WL 4975263
    (S.D.N.Y. Dec. 22, 2009).......................................................................................... 14

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990)....................................................... 11, 20, 23

*SEC v. Universal Consulting Resources*, No. 10-cv-02794, 2010 WL 483733
    (D. Col. Nov. 23, 2010) ............................................................................................ 24

*SEC v. W.J. Howey*, 328 U.S. 293 (1946)...................................................................... 12

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011).................................................................. 11-12, 20

*Tcherépnin v. Knight*, 389 U.S. 332 (1967) ................................................................. 13

*United Housing Found, Inc. v. Forman*, 421 U.S. 837 (1975) ..................................... 13

**Statutes**

<u>Securities Act of 1933</u>

Section 2(a)(1), 15 U.S.C. § 77b(a)(1) ......................................................... 12, 14

Sections 5(a) and (c), 15 U.S.C. §§ 77e(a) and (c) ........................................... 13-14, 15

Section 17(a), 15 U.S.C. § 77q(a) ...........................................................15, 18 n.3

<u>Securities Exchange Act of 1934</u>

Section 3(a)(10), 15 U.S.C. §78c(a)(10) ............................................................ 12

Section 10(b), 15 U.S.C. § 78j(b) .................................................................... 15

Section 21(d)(5), 15 U.S.C. § 78u(d)(5) .......................................................... 21

Section 27, 15 U.S.C. § 78aa ......................................................................... 21

**Rules**
Rule 10b-5, Securities Exchange Act of 1934, 17 C.F.R. §240.10b-5 ................................. 15, 18

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this memorandum of law in support of its *ex parte* emergency application, by proposed order to show cause, against Defendants Maksim Zaslavskiy ("Zaslavskiy"), REcoin Group Foundation, LLC ("REcoin"), and DRC World, Inc. a/k/a Diamond Reserve Club ("Diamond") (collectively, "Defendants"). The Commission seeks both a temporary restraining order pending a preliminary injunction and then a preliminary injunction (1) enjoining further violations of the securities laws; (2) freezing Defendants' assets, (3) requiring Zaslavskiy to repatriate assets now outside the United States; and (4) preventing Defendants from destroying or altering documents. The Commission also seeks expedited discovery, an order requiring an accounting from Defendants, and an order prohibiting Zaslavskiy from leaving the country until he complies with the foregoing.

## PRELIMINARY STATEMENT

The Commission seeks emergency relief primarily to stop Defendants' ongoing fraudulent offer and sale of unregistered securities under the guise of selling "tokens," "coins," "digital currency," or other purported interests. Since July of 2017, Defendant Zaslavskiy has been orchestrating fraudulent offerings, first through REcoin and then through Diamond, as purported sales of interests in so-called "Initial Coin Offerings" ("ICO") and, now, an "Initial Membership Offering" ("IMO"). To induce investors to remit funds, Defendants have been disseminating false and misleading statements with respect to the interests that they are purporting to offer and sell, including that investors will receive a certain digital or tokenized asset in exchange for their purchase; that the interests Defendants are selling are backed by investments into real estate, in the case of REcoin, and diamonds, in the case of Diamond; that teams of professionals have been employed to ensure that the investments perform and that

investors profit; and that the REcoin ICO had been very successful—selling into the millions of dollars—until the U.S. Government forced Defendants to shut it down.

These statements are all false. Investors who gave Defendants money through credit card portals on Defendants' websites got nothing in return—no digital asset, no entry on a blockchain ledger, no coin or token, and certainly no interest in any actual real estate or diamonds. There are no professionals managing the investments, because there are no investments. And the REcoin ICO did not garner anywhere near as much interest as Defendants boasted, because it shut down—not because of the U.S. Government's intervention—but because Zaslavski had moved on to another scheme, the Diamond ICO.

Inducing investors with these lies, Defendants admit they have actually raised at least $300,000 from more than a thousand investors, and that a substantial portion of these amounts remain within Zaslavskiy's control. Zaslavskiy also has acknowledged that he is currently and actively raising funds from investors through Diamond. He has testified that he has imminent plans to leave the country for months, that he already destroyed documents relating to this matter, and that he is transferring assets to purported employees in India and the Ukraine.

The Commission's Complaint alleges that, based on the foregoing, Defendants violated the antifraud provisions of the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act"), as well as the registration provisions of the Securities Act. The material submitted in support of the Commission's application provides ample evidence, not only of Defendants' wrongdoing as alleged in the Complaint, but also of the need for a temporary and preliminary injunction against further violations of these provisions, to protect investors from any additional harm arising out of Defendants' ongoing conduct. And, to preserve the *status quo* and ensure that Defendants do not dissipate or expatriate the assets

necessary to pay the likely monetary judgment to the Commission, the Commission seeks an order freezing Defendants' assets, ordering the repatriation of whatever assets may have already left the country, preventing Defendants from further destroying documents, requiring an accounting of the amounts Defendants have obtained through their fraudulent schemes, and providing that Zaslavskiy turn over his passport and barring Zaslavskiy from leaving the country while he complies with the foregoing orders.

## STATEMENT OF FACTS

### I.   BACKGROUND

An initial coin offering or "ICO" is a fundraising event in which an entity offers participants a unique "coin" or "token" in exchange for consideration (often in the form of virtual currency[1]—most commonly Bitcoin and Ether—or fiat currency).  See Decl. of Valerie A. Szczepanik dated September 29, 2017 ("Szczepanik Decl.") at ¶ 4.  The tokens are issued on a "blockchain" or cryptographically secured ledger.  Id. at ¶ 5.[2]

---

[1]   The Financial Action Task Force, an inter-governmental agency that promotes laws combating anti-money laundering and in which the United States is a member, describes virtual currency as a "digital representation of value that can be digitally traded and functions as (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status . . . in any jurisdiction." Id. at ¶ 4 n.1.

[2]   A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called blocks. Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain. The system relies on cryptographic techniques for secure recording of transactions. A blockchain can be shared and accessed by anyone with appropriate permissions. The Bitcoin blockchain is an example of a "non-permissioned," or public and open access blockchain. Anyone can download the Bitcoin open-source software and join. All participants share a single view of the Bitcoin blockchain, which is updated when Bitcoin network participants reach a consensus on the validity of transactions under review. "Permissioned" or private blockchains are modifications to that model and require permissioned servers to be approved to participate on the network or to access particular information on the blockchain. Blockchains or distributed ledgers can also record what are called smart contracts,

3

The token may entitle its holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights. These tokens may also be listed on online platforms, often called virtual currency exchanges, and tradable for virtual or fiat currencies. Id. at ¶ 6. ICOs are typically announced and promoted through online channels. Issuers usually release a "whitepaper" describing the project and the terms of the ICO. To participate, investors are generally required to transfer funds (often virtual currency) to the issuer's address, online wallet, or other account. After the completion of the ICO, the issuer will distribute its unique "tokens" to the participants' unique address on the blockchain. Id. at ¶ 7.

## II.   ZASLAVSKIY AND RECOIN DEFRAUD INVESTORS IN THE RECOIN ICO

### A.   Zaslavskiy and REcoin Tout the REcoin ICO Pre-Launch

Zaslavskiy began marketing REcoin "tokens," variously calling them "coins" or "cryptocurrency" at least as early as July 7, 2017, when he and REcoin announced the REcoin ICO as scheduled for August 7 through October 9, 2017. Id. at ¶ 9. Zaslavskiy and REcoin stated in a press release, which listed Zaslavskiy under "Contacts" and as the "Founder" of "REcoin Group," that the "proceeds from the initial sale of tokens will be invested in the highly regulated real estate market" and that REcoin will be "managed, tracked and authenticated through blockchain technology" and that an "international team of attorneys and programmers have been working tirelessly on creating solutions for REcoin holders to allow them to enter smart contracts in real estate . . . ." Id. REcoin's website similarly touted Zaslavskiy's supposed "extensive expertise in real estate." Id. at ¶ 16 & Ex. G at 6.

---

which essentially are computer programs designed to execute the terms of a contract when certain triggering conditions are met. Id. at ¶ 5 n.2.

Since at least on or around July 28, 2017, REcoin and Zaslavskiy posted on REcoin's website a whitepaper describing the terms of the REcoin ICO (the "First REcoin Whitepaper"). Id. at ¶ 10. REcoin and Zaslavskiy were also making simultaneous posts about the REcoin ICO on others parts of the Internet, such as a post on Reddit on July 10, 2017, id. at ¶ 13 & Ex. F, and on their website, id. at ¶ 14 & Ex. G.

Among other things, the First REcoin Whitepaper contained the following statements, which were echoed in the Reddit post and the REcoin webiste: (a) "REcoin is backed by real estate investments in countries with a developed and stable economy such as the United States, Canada, the U.K., Switzerland, Japan." Id. at ¶ 12(a) & Ex. D at 02; (b) "REcoin is a new cryptocurrency powered by blockchain technology offering stability ... ." Id. at ¶ 12(b) & Ex. D at 04; (c) "The value of the [REcoin] currency can grow at least two ways: through the steady increasing value of the real estate investments that REcoin is used to purchase, and a higher REcoin value when the demand for REcoin rises." Id. at ¶ 12(c) & Ex. D at 05; (d) "REcoin holders are not just investors, they are also users. REcoin offers an attractive investment opportunity . . . ." Id. at ¶ 12(d) & Ex D. at 06; (e) "The most unique feature of REcoin is smart contracts." Id. at ¶ 12(e) & Ex. D at 07; (f) "The 101REcoinTrust is designed to ensure that all investment activities will be in the interest of REcoin holders and centered around the most profitable forms of real estate. REcoin is led by an experienced team of brokers, lawyers, and developers and invests its proceeds into global real estate based on the soundest strategies, including: [] Investment into properties with stable income, short sales, foreclosures and real estate development in the world's leading economies. [] No dividends are paid out to any beneficiaries, meaning that 100% of the net profile from ReCoin [sic] is reinvested into real estate." Id. at ¶ 12(f) & Ex. D at 08; and (g) "REcoin offers several guarantees to its users to

protect their investment:  [] REcoin's activities are in full compliance and governed by United States law.  [] 100% of our proceeds from REcoin sales minus maintenance costs are invested into real estate . . . .  The REcoin Purse is secured by the latest cryptocurrency tools and designed to be user-friendly and convenient."  Id. at ¶ 12(g) & Ex. D at 09; see also id. at ¶ 13 (Reddit statements); ¶ 15(a)-(d) (website statements).

Other statements posted on the Internet touted, for example, expected "investment profitability from 9% and up to 67% per year," id. ¶ 20 & Ex. K, and the supposed 101REcoin Trust that was "exercising legal and financial control over the actions of the company management." Id.

**B.      Zaslavskiy and RECoin Launch, and Continue to Tout, the REcoin ICO**

The REcoin ICO offered purchasers a discount such that those purchasing during the sale of the first ten million of "REC" would pay $0.85 per unit, with decreasing discounts applying to future sales tranches.  Szczepanik Decl. ¶ 19 & Ex. J.  Starting on August 7, visitors to the REcoin website could click on one of several buttons to "BUY RECOIN," which, after requiring a user to enter an email and create a password, upon information and belief, would permit them to transfer funds via digital currency such as Bitcoin or Ethereum, direct bank transfer, or online payment processing services such as PayPal. Id. at ¶ 18 & Ex. I.

On August 9, 2017, two days after the launch of the REcoin ICO, Zaslavskiy and REcoin issued a press release, widely available throughout the Internet, entitled "REcoin ICO is a hit from the start: the first ever crypto currency hedged by real estate is selling out in droves." (The "August 9 Release").  Id. at ¶ 21 & Ex. L. The August 9 Release touts the supposed success of the ICO, stating, among other things, that REcoin "is proving to be a raging success," and that since the launch of the ICO, "we've raised over $1.5 million in direct REcoin token purchases"

and that "Another $2.3 million is the projected earnings from real estate deals that are on the table as a result of the REcoin ICO success." <u>Id.</u>  The REcoin website, at some after August 3, 2017, also began to have a "counter" feature, purporting to show that "2 894 367 REC" had already been purchased, which, using REcoin's stated discount scheme of 85%, implies approximately $2.46 million in funds raised.  <u>Id.</u> at ¶¶ 25-26; <u>see also</u> <u>id.</u> ¶ 27 & Ex. O.

The Staff of the Commission first contacted Zaslavskiy on August 15, 2017.  <u>Id.</u> at ¶ 30.  On or around August 17, 2017, Zaslavskiy substituted the First REcoin Whitepaper on the REcoin website for a second whitepaper (the "Second REcoin Whitepaper"), <u>see</u> <u>id.</u> at ¶ 23 & Ex. M.  But the Second REcoin Whitepaper contain many of the same statements as the First REcoin Whitepaper, including statements about the supposed trust "led by an experienced team of brokers, attorneys, and developers" that invests proceeds into real estate.  <u>Id.</u> at ¶ 24(a)-(d).

### C.   Zaslavskiy Admits He Defrauded Investors in the REcoin ICO

As Zaslavskiy has now been forced to admit under oath, he knew and understood that the overwhelming majority of the foregoing statements were false.  Zaslavskiy was asked whether it was accurate that the value of the REcoin asset was going to increase through real estate investments, to which he answered "of course not."  <u>Id.</u> at ¶ 29(a).  He admits there is no team of experts and no real estate backing the assets, <u>id.</u> at ¶¶ 29(b), 29(e), that he had no basis for stating that REcoin was in full compliance with U.S. law other than  his own say so, <u>id.</u> at ¶ 29(c), that the purchasers of REcoin obtained nothing in return—certainly no digital currency or token, <u>id.</u> at ¶ 29(d), and that the REcoin ICO generated, at most, approximately $300,000, nowhere near the millions they touted, <u>id.</u> at ¶ 29(f).  As the sole individual in charge of REcoin, Zaslavskiy can hardly claim ignorance about the company's goings on.

III.     **DEFENDANTS DEFRAUD INVESTORS IN THE DIAMOND ICO**

A.      **The Purported Reasons For the REcoin Shutdown**

On September 6, 2017, Defendants announced that they were "switching strategies" from backing their offering with real estate to backing it with diamonds.  Szczepanik Decl. ¶ 32.  The press release described:  "All REcoin holdings will be seamlessly converted into Diamond Reserve Coin (DRC) at the rates favorable to REcoin investors" and that "the DRC holders are now going to be able to use smart contracts not only in real estate but in every facet of commerce, in which the community is going to be engaged."  Id. & Ex. P.

In explaining the reasons for stopping the REcoin ICO and launching the Diamond ICO, Defendants stated in a release that had REcoin's, Diamond's, and Zaslavskiy's name, that the REcoin ICO had been very popular, because "over $1.5 million in direct REcoin token purchases [were made]," and that "another $2.3 million in expected earnings were generated as a result of the REcoin pre-sale success[,]" but that, after that, "the US government did what it does best – interfered," and that "[i]n no uncertain terms, it let us know that we're not allowed to take steps to maintain the level of liquidity of our real estate holdings to keep your investments safe . . . ."  Id. at ¶¶ 37, 40 & Ex. U.

These were more false statements, made to induce individuals who had invested in REcoin to stay with or buy more into Diamond, as well as to attract new purchasers.  As Zaslavskiy now admits, the REcoin ICO raised no more than $300,000, and it shutdown not because of any contact with the U.S. Government, but because Zaslavskiy determined it was "too risky" to invest in real estate.  Id. at ¶¶ 46(a), 46(b).

B.      **The Ongoing, Fraudulent Diamond ICO**

Undaunted, Defendants began promoting and then launched the Diamond ICO, which is still ongoing as of today.  Defendants announced the start of the Diamond ICO on their website, on

Facebook, and on other parts of the Internet, as starting on September 7, 2017.  Szczepanik Decl. ¶¶ 34-35.

The announcements try to distinguish an "ICO" from an "Initial Membership Offering," or "IMO," purporting to be selling simply "memberships" in Diamond.  Id. ¶¶ 34, 36.  However, the documents evidence little distinction.  For example, on September 11, 2017, Defendants released a press release (the "September 11 Release"), which contained REcoin's and Diamond's logos as well as Zaslavskiy's name, explaining that they were shutting down the REcoin ICO and launching the Diamond ICO.  Id. ¶ 37 & Exs. T & U.  The September 11 Release stated, for example, that purchasers of a Diamond "membership" are "entitled to all the opportunities and benefits they were promised at the time of joining the REcoin community" and that "as the [sic] 'Led Zeppelin' would put it, 'The Song Remains the Same.'"  Id. ¶ 38.

And, in touting the Diamond ICO in the September 11 Release, a Diamond whitepaper (the "Diamond Whitepaper") and the Diamond website, Defendants made additional misstatements.  Specifically, that "[j]ust as is REcoin, DRC is powered by blockchain technology," id. ¶ 39(a), that "the Diamond token would be hedged by diamonds "especially stored in secure locations in the United States and fully insured for their full value," id. ¶ 39(c), and that Diamond will be "led by industry experts" and that a group would be formed to, among other things, ensure that "all diamonds are purchased at the best possible price" and "perform strategic sale/purchase transactions which would benefit the DRC, where 100% of the profit is reinvested back into diamonds."  Id. ¶ 42(a) & Ex. V.

The Diamond website permits users to provide an email and then transfer funds via credit card or digital currency.  Id. ¶ 43.  Once registered, users receive periodic email updates from "Max for DRC," including a recent email in which Zaslavskiy and Diamonds state that "for the

growth in the value of your DRC tokens, we forecast a minimum growth of 10% to 15% per
year.  Please note that this is the minimum forecast.  Judging by the number of applications we
receive daily, these numbers are not the limit.  We are just saying 'Do not miss the moment!"
Id. ¶ 44 & Ex. X.

Zaslavskiy has testified under oath and admitted to the Commission Staff that many of
the foregoing statements made by Defendants in the Diamond Whitepaper, the Diamond website,
and the September 11 Release, are false.  For example, Zaslavskiy admitted that there are no
diamonds and that he has not even identified a supposed location for them, and that there is not
yet any cryptography or blockchain technology representing the supposed Diamond
"memberships."  Id. ¶¶ 46(c) & 46(d).  There are also no "experts" buying diamonds for him.

## IV.   ZASLAVSKIY'S ONGOING CONDUCT AND CONTACTS WITH THE COMMISSION STAFF

The Staff first issued an administrative subpoena to Zaslavskiy and REcoin on September
14, 2017, asking for, among other things, communications with potential purchasers of REcoin.
Szczepanik Decl. ¶ 47 & Ex. Y.  The subpoena required Zaslavskiy to produce certain
documents by September 25, 2017, but, when Zaslavskiy appeared for testimony on September
20, he indicated he would not produce any documents related to "tokens" or "coins" because the
REcoin interests were neither, despite repeated statements in the REcoin materials referring to
the items as such.  Id. ¶ 48.  Because Zaslavskiy refused to produce documents in response to the
aforementioned subpoena, the Staff issued new subpoenas to Defendants requesting
communications in connection with the potential purchase of any "asset" offered by REcoin or
Diamond, on September 20, 2017.  Id. ¶ 49 & Ex. Z.  Defendants have not produced any
documents in response to the subpoena.  Zaslavskiy indicated to the Staff, on September 20,

2017, that he was going to be in Brooklyn for "the next [Jewish] holiday" but that after that he would be in Ukraine for "about a month or two." Id. ¶ 56.

When the Staff asked Zaslavskiy the source of the funds for his ventures, he invoked the Fifth Amendment. Id. ¶ 50. Zaslavskiy also indicated to the Staff that he had been recently deleting emails from his Gmail account, and had not kept copies of previous versions of files evidencing communications prepared for potential investors. Id. ¶ 54.

Both the REcoin Website and the Diamond Website are still live and the Second REcoin Website and Diamond Website are available to users on the Internet. Diamond is currently accepting funds from investors, id. ¶ 51, and Zaslavskiy has plans to launch additional websites that will have fund-raising interfaces, including one he calls "MLT Hub." Id. ¶ 52. Zaslavskiy indicated to the Staff that he travelled abroad three to four times last year, including to Ukraine and Russia, and including one trip that lasted "almost three months." Ex. A at 156:22-157:15.

## ARGUMENT

### I. DEFENDANTS SHOULD BE TEMPORARILY RESTRAINED AND PRELIMINARILY ENJOINED FROM FURTHER VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Because the Commission is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975). The Commission need not show irreparable harm, a balance of equities in its favor, or that remedies at law are unavailable. *Id.*; *see also Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011); *SEC v. Unifund SAL*, 910 F.2d 1028, 1036 (2d Cir. 1990). Instead, the Commission is entitled to the entry of temporary and preliminary injunctive relief against future securities laws violations upon a "substantial showing of

likelihood of success as to both a current violation and the risk of repetition." *Smith*, 653 F.3d at

127-28 (quoting *SEC v. Cavanaugh*, 155 F.3d 129, 132 (2d Cir. 1998)).

Here, the Commission makes a "substantial showing" that Defendants have violated and

are still violating the antifraud and registration provisions of the Securities Act and the Exchange

Act and rules thereunder.  Given the ongoing and egregious nature of these violations, a

temporary restraining order is warranted to protect investors from further harm and to preserve

the *status quo* pending a preliminary injunction hearing.

A.    **The Interests Offered and Sold in the ICOs Are Securities**

Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act define

"security" to include "investment contract[s]."  As a threshold matter, the interests offered and

sold in this particular case in REcoin and Diamond—whether termed "cryptocurrencies,"

"tokens," "coins," "memberships" or whatever else—were "securities" under the seminal test to

determine what an investment contract is, as set forth in *SEC v. W.J. Howey*, 328 U.S. 293

(1946).  The *Howey* test looks to whether there was (1) an investment of money in (2) a common

enterprise,  (3) with a reasonable expectation of profits to be derived from the entrepreneurial or

managerial efforts of others.  *Id.* at 301; *see also SEC v. Edwards*, 540 U.S. 389, 393 (2004).

This definition embodies a "flexible rather than a static principle, one that is capable of

adaptation to meet the countless and variable schemes devised by those who seek the use of the

money of others on the promise of profits." *Howey*, 328 U.S. at 299.

Here, all three factors are met.  Zaslavskiy admits he solicited and received payments

through the REcoin and Diamond websites.  Investors who purchased interests in REcoin and

Diamond would reasonably believe from the marketing materials disseminated by Defendants

that Defendants would be investing the proceeds of token sales into the costs of running the

12

business and in investing in real estate, for REcoin, and diamonds, for Diamond, and that their investment interests would increase in value through Defendants' entrepreneurial and managerial efforts. In the case of REcoin, for example, Zaslavskiy touted his own real estate acumen and falsely claimed to have hired "an experienced team of brokers, lawyers, and developers." In the case of Diamond, he also touted a team of supposed experts that would make the best investment decisions in diamonds for the enterprise.

In the Second Circuit, a common enterprise can be established by demonstrating horizontal commonality, or "the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." *Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994). Here, the investor assets at issue were in fact pooled and, while profits were not to be distributed in the form of dividends, they were purportedly to be reinvested in the ventures, and as such horizontal commonality exists.

And even though Defendants have variously sought to recast the interest they sold as "digital currency," and later as "token," and later still as "memberships" in clubs (demonstrating nothing but a naked attempt to skirt the securities laws altogether), the economic substance of these transactions makes clear that this label makes no difference. In analyzing whether something is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), "and the emphasis should be on economic realities underlying a transaction, and not on the name appended thereto." *United Housing Found, Inc. v. Forman*, 421 U.S. 837, 849 (1975).

### B.   Defendants' Ongoing Offers and Sales of Unregistered Securities

Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), prohibit any

person from selling a security through interstate commerce "[u]nless a registration statement is in

effect as to [such] security," or from offering to sell or offering to buy a security "unless a

registration statement has been filed as to such security." To establish a prima facie case for a

Section 5 violation, the Commission must prove: "[F]irst, that no registration statement was in

effect as to the securities; second, that the defendant sold or offered to sell these securities; [and]

third, that there was a use of interstate transportation, or communication, or of the mails in

connection with the sale or offer of sale." *SEC v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y.),

*aff'd*, 155 F.3d 129 (2d Cir. 1998). Further, "[l]iability does not require that the defendant

actually passed title of the security. Any person who 'engaged in steps necessary to the

distribution' of the unregistered security is liable under Section 5." *SEC v. Tecumseh Holding

Corp.*, No. 03 Civ. 5490 (SAS), 2009 WL 4975263, at *3 (S.D.N.Y. Dec. 22, 2009) (quoting

*SEC v. Chinese Consol. Benev. Ass'n*, 120 F.2d 738, 741 (2d Cir.1941)).

Here, there is no question that there was no registration statement in effect as to the

interests sold or that the means of interstate communication (the Internet) was used in connection

with the offer or sale of the securities. Moreover, although Zaslavskiy admits he never issued

any digital tokens (because he never implemented the technology to do so), that is of no matter –

Defendants offered and sold securities (here, investment contracts) to potential and actual

investors. *See* 15 U.S.C. 77b(a)(4) (definition of "issuer" is broadly defined to include "every

person who issues or proposes to issue any security").

Defendants are each liable under Section 5. REcoin and Diamond are liable as the

issuers. And Zaslavskiy is liable for his "necessary role" in the offering since he was the sole

14

officer and director of REcoin and Diamond, and has admitted that he drafted or directed the

drafting of the REcoin and Diamond Whitepapers and the other materials distributed to potential

and actual investors. *See, e.g., SEC v. Murphy*, 626 F.2d 633, at 650-51 (9th Cir. 1980) ("[T]hose

who ha[ve] a necessary role in the transaction are held liable as participants.") (citing *SEC v. North*

*Am. Research & Dev. Corp.*, 424 F.2d 63, 81 (2d Cir. 1970); *SEC v. Culpepper*, 270 F.2d 241, 247

(2d Cir. 1959); *SEC v. International Chem. Dev. Corp.*, 469 F.2d 20, 28 (10th Cir. 1972); *Pennaluna*

*& Co. v. SEC*, 410 F.2d 861, 864 n.1, 868 (9th Cir. 1969)); *SEC v. Softpoint, Inc.*, 958 F. Supp 846,

859-60 (S.D.N.Y. 1997) ("The prohibitions of Section 5... sweep[] broadly to encompass 'any

person' who participates in the offer or sale of an unregistered, non-exempt security."); *SEC v.*

*Chinese Consol. Benevolent Ass'n.*, 120 F.2d 738, 740-41 (2d Cir. 1941) (defendant violated Section

5(a) "because it engaged in selling unregistered securities" issued by a third party "when it solicited

offers to buy the securities 'for value'"). The Commission has met its prima facie case to show

Defendants each violated Section 5.

### C.    Defendants' Ongoing Violations of the Anti-Fraud Provisions

Section 17(a) of the Securities Act makes it unlawful for any person, in the offer or sale

of a security, to (1) "employ any device, scheme, or artifice to defraud"; (2) "obtain money or

property by means of any untrue statement of a material fact" or a material omission necessary to

make the statements made not misleading; or (3) "engage in any transaction, practice, or course

of business which . . . operates or would operate as a fraud or deceit upon the purchaser."

Section 17(a)(1) requires a showing that the defendant acted with scienter. Scienter is not an

element of Sections 17(a)(2) or (3) of the Securities Act; accordingly, a showing of negligence

by the Defendants is sufficient to establish a violation of those sections. *SEC v. Pentagon*

*Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013).

Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder make it unlawful for any person, in connection with the purchase or sale of a security, to make untrue statements of material fact, or to omit material facts necessary to make statements made not misleading. Rules 10b-5(a) and (c) prohibit employing any device, scheme, or artifice to defraud, and engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. Section 10(b) of the Exchange Act and Rule 10b-5 require a showing that the defendant acted with scienter. *Aaron v. SEC*, 446 U.S. 680, 695 (1980). Reckless conduct generally satisfies the scienter requirement. *See, e.g., SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998).

Defendants "made" the statements at issue. As discussed above, Zaslavskiy admits he was solely responsible for both Companies. Indeed, his photograph and name appear in the REcoin website, his name appears at the bottom of company press releases, and emails are sent under his name and from his email address on behalf of the entities. The Companies' logos and Zaslavskiy's name appear in the September 11 Release, and each Company's logo appears in their respective website and Whitepapers. Zaslavskiy had the "ultimate authority" over the statements included on the website, in the press releases, and in the emails and he was therefore the "maker" for purposes of *Janus. See Janus Capital Grp., Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011); *see, e.g., In re Fannie Mae 2008 Secs. Litig.*, 891 F. Supp. 2d 458, 473 (S.D.N.Y. 2012), *aff'd*, No. 12–3859, 2013 WL 1982534 (2d Cir. May 15, 2013) ("In the post-*Janus* world, an executive may be held accountable where the executive had ultimate authority over the company's statement; signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive").

Falsity.  There can be no question that, as Zaslavskiy repeatedly admitted during testimony, many of the statements Defendants made were plainly and callously false.  REcoin was not "backed by real estate."  REcoin had no "team of professionals."  It employed no blockchain technology.  REcoin did not raise over $2 million, and REcoin was not shut down by the Government.  So, too, in the case of statements made in connection with the Diamond ICO, which include statements about REcoin's popularity and profitability:  there were no diamonds backing the offering, and there was no "group" of experts selecting diamonds.

Materiality.  The misstatements and omissions at issue are material.  A statement or omission is material if there is a substantial likelihood that a reasonable investor would consider such information important in making an investment decision or if the information would significantly alter the total mix of available information.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  A reasonable investor would want to know if he was not getting the digital token he had been promised, if the Companies' attempt to appear as if they were conducting a legitimate business was a sham, if it Defendants' own inability to deliver the promised returns that had triggered the shutdown of the REcoin ICO, and whether the REcoin was nowhere near as successful in raising funds from other investors as Defendants claimed it was.  Moreover, a reasonable investor would have wanted to know if no blockchain technology, encryption, token, or smart contracts were being used by REcoin or Diamond, as Defendants claimed.

Scienter.  Zaslavskiy acted with scienter.  He has admitted on the record that some of the statements at issue here were false and misleading and that no corrections were issued.  Specifically, he knew that the U.S. Government had not shut down the REcoin ICO but, rather, he had decided to shut it down because it would not be profitable; that the REcoin ICO had not raised anywhere near the more that $2 million he stated it had, that REcoin and Diamond had not

17

purchased any of the promised "hedges" and, indeed, had no operations, and that there was no blockchain or other technology developed for the companies, who did not actually issue any tokens to purchasers. Further, as the sole owner, Zaslavskiy's scienter may be properly attributed to the Companies. *Manor Nursing Centers*, 485 F.2d at 1089 n.3.[3]

 The statements were made "In" and "In Connection With" the offer or sale of a security. Defendants made the statements both in the offer and sale and in connection with the purchase or sale of securities because they were made to induce purchases of interests in REcoin and Diamond.

 Defendants engaged in a scheme to defraud. Finally, Defendants engaged in a scheme to defraud that included not only the statements alleged here, but also the setting up of fraudulent websites, shell companies, and attempting to give the appearance of legitimacy by touting non-existing connections with other enterprises that they set up and controlled for purposes of effectuating the fraud. These are all "inherently deceptive" sufficient to constitute a scheme in violation of Rules 10b-5(a) and 10b-5(c). *See, e.g., SEC v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011).

 Defendants obtained Money or Property. Defendants obtained money and property in the offer and sale of securities by means of their false statements because without those false

---

[3] Zaslavskiy told the Staff in testimony that some of the misstatements were "errors" made by individuals he has hired to prepare these statements but, far from confessing negligence in the statements made to investors, issuing retractions or corrections, Defendants allowed many of the misstatements to remain posted on the Internet because Zaslavskiy did not "want to look worse" by admitting error. And, even if the Court were to eventually credit the incredible proposition that Zaslavskiy could simply "mistake," for example, the amount of funds raised by a magnitude of nearly ten-fold, or "mistake" a fictitious shut-down call from the Government, Zaslavskiy's self-avowed negligence in permitting statements to be published without his review would be sufficient to find him in violation of Sections 17(a)(2) and (3) at a bare minimum.

statements investors would have never given Defendants the monies which Zaslavskiy has already obtained.

### D.     Defendants' Conduct is Ongoing

In determining whether to grant emergency relief, courts consider the likelihood that, unless enjoined, a defendant will violate the securities laws again. *Cavanagh*, 155 F.3d at 135.  As the Second Circuit has explained, "the commission of past illegal conduct is highly suggestive of the likelihood of future violations" and that "cessation of illegal activity does not ipso facto justify the denial of an injunction." *Mgmt. Dynamics*, 515 F.2d at 807 (citations omitted).  In assessing likelihood of repetition, courts also look to such factors as the character of the violation, the degree of scienter involved, and the degree to which a defendants' occupation or activities may present future opportunities to violate the law.  *E.g.*, *Cavanagh*, 155 F.3d at 135; *SEC v. Commonwealth Chem. Secs. Inc.*, 574 F.2d 90, 100 (2d Cir. 1978); *SEC v. Musella*, 578 F. Supp. 425, 444 (S.D.N.Y. 1984).  Courts may also look to the likelihood that a defendant's business activities might again involve him in such transactions and his or her recognition of culpability coupled with the sincerity of assurances against future violations.  *SEC v. Suter*, 732 F.2d 1294, 1301 (7th Cir. 1984).

Here, where the Diamond ICO is still ongoing, there is no question that the violative conduct not only risks repeating, but *is* repeating, making an injunction necessary *a fortiori*.  All factors point to the need for emergency relief.  Because Defendant Zaslavskiy is engaged in an activity (the Diamond ICO (or IMO)) that he himself described as essentially the same as the prior acts (the REcoin ICO), his business activities and his occupations do in fact present an opportunity for a future violation.  Nor has Zaslavskiy accepted full responsibility or offered any assurance against a future violations, but has instead defied the Staff's attempt to conduct a routine

investigation into the contours of his fundraising activities by declaring that he would not produce all documents responsive to the Commission's subpoena and by destroying documents.

Finally, given the degree of scienter with which the violations occurred—an overstatement of over five-fold, for example, of the amounts raised, and a naked fabrication about the reason the REcoin ICO shut down—the degree of scienter also indicates that defendant is a likely recidivist securities law violator.

## II.   THE COURT SHOULD FREEZE DEFENDANTS' ASSETS.

"A freeze of assets is an ancillary remedy that merely 'assures that any funds that become due can be collected,'…including disgorgement of profits, penalties equal to three times the profits, …and possibly prejudgment interest." *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 416 (S.D.N.Y. 2001) (quoting *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990)). An asset freeze simply "functions like an attachment." *Unifund*, 910 F.2d at 1041.

To obtain an asset freeze, "the SEC must show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Smith v. SEC*, 653 F.3d 121, 128 (2d Cir. 2011) (internal quotation marks and citations omitted). This standard is lower than that required for the Commission to obtain a preliminary injunction against future securities law violations. *See Unifund*, 901 F.2d at 1041 (holding that "an ancillary remedy" of an asset freeze "may be granted, even in circumstances where the elements required to support a traditional SEC injunction have not been established"); *SEC v. Hedén*, 51 F. Supp. 2d 296, 298 (S.D.N.Y. 1999) (holding that an asset freeze requires "a lesser showing" than a preliminary injunction against future securities law violations).

As set forth above, the Commission is likely to succeed on the merits of its fraudulent misrepresentation and deceptive conduct case against Defendants, as well as on its claims that

Defendants' engaged in the unregistered offers or sales of securities. At a minimum, an inference can be drawn that Defendants violated the antifraud provisions. Either way, an asset freeze is appropriate, particularly to prevent Zaslavskiy from moving funds to a foreign bank account or otherwise dissipating assets to avoid having to satisfy an eventual monetary judgment.

Moreover, as someone with extensive ties to Ukraine, Zaslavskiy may hold foreign bank accounts. And REcoin's and Diamond's purported employees, except Zaslavskiy, all reside abroad. Without an asset freeze, Defendants are likely to dissipate funds or transfer funds to foreign accounts beyond the Court's jurisdiction, rendering the Commission unable to collect any disgorgement, prejudgment interest, or civil penalty awarded in a final judgment. An asset freeze is therefore necessary and appropriate. *See, e.g., Gonzalez de Castilla*, 145 F. Supp. 2d at 420 (granting asset freeze where defendant's "status as a citizen and resident of Mexico with accounts at Mexican banks raises a danger that the funds would be dissipated or transferred beyond this Court's jurisdiction if his account did not remain frozen") (citing *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 215–16 (1945) (holding, in antitrust action, that "sequestration of [defendants'] property is the only means of enforcing this Court's orders or decree against said foreign corporate defendants. The principal business of said defendants is carried on in foreign countries and they could quickly withdraw their assets from the United States and so prevent enforcement of any order or decree which this Court may render.")).

## III.    OTHER ANCILLARY RELIEF IS NECESSARY

Exchange Act Section 21(d)(5) authorizes the Court to grant equitable relief "that may be appropriate or necessary for the benefit of investors," 15 U.S.C. § 78u(d)(5). And, pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, the Court has general equitable powers in Commission actions. *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103-04 (2d Cir. 1972).

Pursuant to such powers, this Court may order ancillary relief to effectuate the purposes of the federal securities laws, and to ensure that wrongdoers do not profit from their unlawful conduct. *Id.*

### A.     An Order to Repatriate Assets Is Necessary

Courts routinely use their equitable powers in Commission actions to order defendants to repatriate assets held in foreign accounts or locations, usually to help effectuate an asset freeze. *See, e.g., SEC v. Compania Internacional Financiera S.A.*, 2011 WL 3251813, at *13 (S.D.N.Y. July 29, 2011) ("[A]n order to bring assets to the United States is appropriate if needed to make effective an asset freeze and preserve assets for potential future relief."); *SEC v. Illarramendi*, 2011 WL 2457734, at *6 (D. Conn. 2011) ("[W]here the Court has the authority to order equitable relief such as an asset freeze in order to preserve particular funds in anticipation of potential future disgorgement, it also has the authority to order repatriation of assets to effectuate that freeze order.").  Moreover, a repatriation order is appropriate so that the Commission can meaningfully pursue enforcement of any order ultimately requiring Defendants to disgorge their ill-gotten gains and pay civil penalties. *See, e.g., SEC v. Chemical Trust*, No. 00-8015, 2000 WL 33231600, at *12 (S.D. Fla. Dec. 19, 2000) (citing *Manor Nursing Ctrs., Inc.*, 458 F.2d at 1082).

A repatriation order is appropriate here, particularly given that Zaslavskiy has acknowledged transferring assets abroad to pay individuals in Ukraine and India whom he alleges work for REcoin and Diamond, while invoking the Fifth Amendment when asked the source of these funds.  The Commission seeks an order requiring Zaslavskiy to repatriate funds or other assets he holds in foreign locations by moving them to the United States and within the Court's jurisdiction.

**B.    Defendants Should Be Ordered to Provide An Accounting**

To accurately determine the scope of a fraud and a defendant's ability to disgorge illicit proceeds, courts frequently require defendants to provide an accounting of all monies or property obtained as a result of the fraudulent activity, as well as their current financial resources or assets. *See, e.g., SEC v. Int'l Swiss Inv. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *SEC v. Spongetech Delivery Sys., Inc.*, No. 10-cv-2031, 2011 WL 887940, at *5 (E.D.N.Y. Mar. 14, 2011) (noting that ordering an accounting is "minimally intrusive") (citing *SEC v. Bremont*, 954 F. Supp. 726, 733 (S.D.N.Y. 1997)).  In this case, where Defendants admit they have raised funds from thousands of investors in a digital format that creates a record for Defendants, an accounting is both necessary to the Commission and minimally burdensome to Defendants.

**C.    Expedited Discovery and an Order Mandating
         Preservation of Documents Are Appropriate**

The Court should grant the Commission's request for expedited discovery in order to permit the Commission to present evidence to the Court at a hearing on the Commission's application for a preliminary injunction.  In this case, where Defendants have resisted the Commission's attempts to obtain relevant information through the administrative subpoena process, and the Commission has had only a few days to subpoena and obtain all relevant documents and to elicit testimony from those with essential information, an order expediting discovery is particularly necessary.

To preserve documents that the Commission may later seek through discovery requests, the Commission further seeks an order prohibiting Defendants from altering, destroying, or concealing documents, including documents concerning the allegations of the Complaint or the assets or finances of Defendants.  Such orders are routinely granted "to preserve the status quo until a final resolution of the merits." *Spongetech Delivery*, 2011 WL 887940, at *5 (citing *Unifund*, 910 F.2d

at 1040 n. 11).  An order is particularly needed in this matter where Defendants have already admitted to the destruction of relevant documents.

### D.    A *Ne Exeat* Order Is Necessary

The Commission seeks an order requiring Zaslavskiy to surrender his passport to the Clerk of the Court, and to prohibit him from leaving the United States until he has completed a verified accounting and repatriated assets.  An order directing Defendant to surrender his passport is an appropriate use of the Court's equitable powers that will serve to preserve the *status quo*.  Such an order is particularly necessary here, where Zaslavskiy has averred a desire to travel to Ukraine for one to two months, indicated that he has traveled abroad several months in the last year, and acknowledged extensive contacts abroad.  There is ample precedent for courts ordering such ancillary relief in SEC enforcement cases.  *See, e.g., SEC v. Roth*, No. 11-cv-2079, Docket No. 9 (N.D. Ill. Mar. 21, 2011); *SEC v. Reynolds*, C.A. No. 3:08-CV-438-B, 2011 WL 16903395, at *7 (N.D. Tex. Mar. 16, 2011) ("Further, in order to ensure that he does not flee the jurisdiction of this Court, Reynolds is directed to surrender his passport to the Clerk of Court within 48 hours. Failure to surrender the passport in the required time frame will result in the Court issuing a warrant for Reynold's arrest."); *SEC v. Resource Development Int'l, LLC*, 3:02-cv-0605, Docket No. 9 at ¶ 10 (N.D. Tex. Mar. 25, 2002) ("It is necessary to order the surrender of passports to ensure that the specified defendants [do] not flee the jurisdiction of the Court."); *SEC v. Universal Consulting Resources*, No. 10-cv-02794, 2010 WL 483733, at *7 (D. Col. Nov. 23, 2010); *SEC v. Private Equity Management Group*, No. CV 09-2901, 2009 WL 1310984, at *7 (C.D. Cal. Apr. 27, 2009); *SEC v. Benger*, No. 09-cv-676, Docket No. 18 (N.D. Ill. Feb. 3, 2009).

## CONCLUSION

For the foregoing reasons, the Court should grant the Commission's emergency

application.

Dated: New York, New York
       September 29, 2017

                                        _____
                                        Jorge G. Tenreiro

                                        Valerie A. Szczepanik
                                        Attorneys for Plaintiff
                                        SECURITIES AND EXCHANGE
                                        COMMISSION
                                        New York Regional Office
                                        Brookfield Place
                                        200 Vesey Street, Suite 400
                                        New York, New York 10281
                                        (212) 336-9145 (Tenreiro)
                                        TenreiroJ@sec.gov